# GREAT-WEST LIFE & ANNUITY INSURANCE CO. ET AL. *v.* KNUDSON ET AL.

No. 99–1786. Argued October 1, 2001—Decided January 8, 2002

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, and THOMAS, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 221. GINSBURG, J., filed a dissenting opinion, in which STEVENS, SOUTER, and BREYER, JJ., joined, *post*, p. 224.

*James F. Jorden* argued the cause for petitioners. With him on the briefs were *Waldemar J. Pflepsen, Jr., Stephen H. Goldberg, David C. Aspinwall, Thomas H. Lawrence,* and *John M. Russell.*

*Paul R. Q. Wolfson* argued the cause for the United States as *amicus curiae* in support of petitioners. On the brief were *Acting Solicitor General Underwood, Deputy Solicitor General Kneedler, Beth S. Brinkmann, Judith E. Kramer, Allen H. Feldman, Nathaniel L. Spiller,* and *Gary K. Stearman.*

*Richard G. Taranto,* by invitation of the Court, 532 U. S. 917, argued the cause as *amicus curiae* urging affirmance. *Jeffrey S. Pop* filed a brief for respondent Janette Knudson.\*

JUSTICE SCALIA delivered the opinion of the Court.

The question presented is whether § 502(a)(3) of the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 891, 29 U. S. C. § 1132(a)(3) (1994 ed.), authorizes this action by petitioners to enforce a reimbursement provision of an ERISA plan.

---

*Briefs of *amici curiae* urging reversal were filed for the American Association of Health Plans et al. by *Stephanie W. Kanwit, Louis Saccoccio, Robin S. Conrad,* and *Jeffrey Gabardi;* for AARP et al. by *Paula Brantner, Mary Ellen Signorille,* and *Melvin Radowitz;* for the Central States, Southeast and Southwest Areas Health and Welfare Fund by *John A. Kukankos, James L. Coghlan, Francis E. Stepnowski, Debra M. Cyranoski,* and *William J. Nellis;* for the National Association of Subrogation Professionals, Inc., by *Mark D. Spencer;* and for the Self-Insurance Institute of America, Inc., by *George J. Pantos.*

*Arthur H. Bryant, F. Paul Bland, Jr.,* and *Leslie Brueckner* filed a brief for the Maryland HMO Subrogation Plaintiffs as *amici curiae.*

## I

Respondent Janette Knudson was rendered quadriplegic by a car accident in June 1992. Because her then-husband, respondent Eric Knudson, was employed by petitioner Earth Systems, Inc., Janette was covered by the Health and Welfare Plan for Employees and Dependents of Earth Systems, Inc. (Plan). The Plan covered $411,157.11 of Janette's medical expenses, of which all except $75,000 was paid by petitioner Great-West Life & Annuity Insurance Co. pursuant to a "stop-loss" insurance agreement with the Plan.

The Plan includes a reimbursement provision that is the basis for the present lawsuit. This provides that the Plan shall have "the right to recover from the [beneficiary] any payment for benefits" paid by the Plan that the beneficiary is entitled to recover from a third party. App. 58. Specifically, the Plan has "a first lien upon any recovery, whether by settlement, judgment or otherwise," that the beneficiary receives from the third party, not to exceed "the amount of benefits paid [by the Plan] . . . [or] the amount received by the [beneficiary] for such medical treatment . . . ." *Id.,* at 58–59. If the beneficiary recovers from a third party and fails to reimburse the Plan, "then he will be personally liable to [the Plan] . . . up to the amount of the first lien." *Id.,* at 59. Pursuant to an agreement between the Plan and Great-West, the Plan "assign[ed] to Great-West all of its rights to make, litigate, negotiate, settle, compromise, release or waive" any claim under the reimbursement provision. *Id.,* at 45.

In late 1993, the Knudsons filed a tort action in California state court seeking to recover from Hyundai Motor Company, the manufacturer of the car they were riding in at the time of the accident, and other alleged tortfeasors. The parties to that action negotiated a $650,000 settlement, a notice of which was mailed to Great-West. This allocated $256,745.30 to a Special Needs Trust under Cal. Prob. Code Ann. §3611 (West 1991 and Supp. 1993) to provide for

Janette's medical care; $373,426 to attorney's fees and costs; $5,000 to reimburse the California Medicaid program (Medi-Cal); and $13,828.70 (the portion of the settlement attributable to past medical expenses) to satisfy Great-West's claim under the reimbursement provision of the Plan.

The day before the hearing scheduled for judicial approval of the settlement, Great-West, calling itself a defendant and asserting that the state-court action involved federal claims related to ERISA, filed in the United States District Court for the Central District of California a notice of removal pursuant to 28 U. S. C. § 1441 (1994 ed.). That court concluded that Great-West was not a defendant and could not remove the case, and therefore remanded to the state court, which approved the settlement. The state court's order provided that the defendants would pay the settlement amount allocated to the Special Needs Trust directly to the trust, and the remaining amounts to respondents' attorney, who, in turn, would tender checks to Medi-Cal and Great-West.

Great-West, however, never cashed the check it received from respondents' attorney. Instead, at the same time that Great-West sought to remove the state-law tort action, it filed this action in the same federal court (the United States District Court for the Central District of California), seeking injunctive and declaratory relief under § 502(a)(3) to enforce the reimbursement provision of the Plan by requiring the Knudsons to pay the Plan $411,157.11 of any proceeds recovered from third parties. Great-West subsequently filed an amended complaint adding Earth Systems and the Plan as plaintiffs and seeking a temporary restraining order against continuation of the state-court proceedings for approval of the settlement. The District Court denied the temporary restraining order, a ruling that petitioners did not appeal. After the state court approved the settlement and the money was disbursed, the District Court granted summary judgment to the Knudsons. It held that the language of the Plan limited its right of reimbursement to the amount received by

respondents from third parties *for past medical treatment,* an amount that the state court determined was $13,828.70. The United States Court of Appeals for the Ninth Circuit affirmed on different grounds. Judgt. order reported at 208 F. 3d 221 (2000). Citing *FMC Medical Plan* v. *Owens,* 122 F. 3d 1258 (CA9 1997), it held that judicially decreed reimbursement for payments made to a beneficiary of an insurance plan by a third party is not equitable relief and is therefore not authorized by § 502(a)(3). We granted certiorari. 531 U. S. 1124 (2001).

## II

We have observed repeatedly that ERISA is a " 'comprehensive and reticulated statute,' the product of a decade of congressional study of the Nation's private employee benefit system." *Mertens* v. *Hewitt Associates,* 508 U. S. 248, 251 (1993) (quoting *Nachman Corp.* v. *Pension Benefit Guaranty Corporation,* 446 U. S. 359, 361 (1980)). We have therefore been especially "reluctant to tamper with [the] enforcement scheme" embodied in the statute by extending remedies not specifically authorized by its text. *Massachusetts Mut. Life Ins. Co.* v. *Russell,* 473 U. S. 134, 147 (1985). Indeed, we have noted that ERISA's "carefully crafted and detailed enforcement scheme provides 'strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.' " *Mertens, supra,* at 254 (quoting *Russell, supra,* at 146–147).

Section 502(a)(3) authorizes a civil action:

> "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates . . . the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of . . . the terms of the plan." 29 U. S. C. § 1132(a)(3) (1994 ed.).

As we explained in *Mertens,* " '[e]quitable' relief must mean *something* less than *all* relief." 508 U. S., at 258, n. 8.

Thus, in *Mertens* we rejected a reading of the statute that would extend the relief obtainable under § 502(a)(3) to whatever relief a court of equity is empowered to provide in the particular case at issue (which could include legal remedies that would otherwise be beyond the scope of the equity court's authority). Such a reading, we said, would "limit the relief *not at all*" and "render the modifier ['equitable'] superfluous." *Id.*, at 257–258. Instead, we held that the term "equitable relief" in § 502(a)(3) must refer to "those categories of relief that were *typically* available in equity . . . ." *Id.*, at 256.

Here, petitioners seek, in essence, to impose personal liability on respondents for a contractual obligation to pay money—relief that was not typically available in equity. "A claim for money due and owing under a contract is 'quintessentially an action at law.'" *Wal-Mart Stores, Inc.* v. *Wells*, 213 F. 3d 398, 401 (CA7 2000) (Posner, J.). "Almost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." *Bowen* v. *Massachusetts*, 487 U. S. 879, 918–919 (1988) (SCALIA, J., dissenting). And "[m]oney damages are, of course, the classic form of *legal* relief." *Mertens, supra*, at 255.

Nevertheless, petitioners, along with their *amicus* the United States, struggle to characterize the relief sought as "equitable" under the standard set by *Mertens.* We are not persuaded.

## A

First, petitioners argue that they are entitled to relief under § 502(a)(3)(A) because they seek "to enjoin a[n] act or practice"—respondents' failure to reimburse the Plan— "which violates . . . the terms of the plan." But an injunction to compel the payment of money past due under a con-

tract, or specific performance of a past due monetary obligation, was not typically available in equity.[1] See, *e. g.,* 3 Restatement (Second) of Contracts § 359 (1979); 3 Dobbs § 12.8(2), at 199; 5A A. Corbin, Contracts § 1142, p. 119 (1964) (hereinafter Corbin). Those rare cases in which a court of equity would decree specific performance of a contract to transfer funds were suits that, unlike the present case, sought to prevent future losses that either were incalculable or would be greater than the sum awarded. For example, specific performance might be available to enforce an agreement to lend money "when the unavailability of alternative financing would leave the plaintiff with injuries that are difficult to value; or to enforce an obligor's duty to make future monthly payments, after the obligor had consistently refused to make past payments concededly due, and thus threatened the obligee with the burden of bringing multiple damages actions." *Bowen, supra,* at 918 (SCALIA, J., dissenting). See also 3 Dobbs § 12.8(2), at 200; 5A Corbin § 1142, at 117–118. Typically, however, specific performance of a contract to pay money was not available in equity.

---

[1] At oral argument, petitioners' counsel argued that the injunction specifically authorized by § 502(a)(3)(A) need not be a form of equitable relief. Petitioners' brief, however, conceded that the reference in § 502(a)(3)(B) to "*other* appropriate equitable relief" suggests that the relief authorized in § 502(a)(3)(A) "to enjoin any act or practice which violates . . . the terms of [a] plan" is, itself, "appropriate *equitable* relief." See Brief for Petitioners 15, n. 6 (emphasis added). In any event, injunction is inherently an equitable remedy, see, *e. g., Reich* v. *Continental Casualty Co.,* 33 F. 3d 754, 756 (CA7 1994); 1 D. Dobbs, Law of Remedies § 1.2, p. 11 (2d ed. 1993) (hereinafter Dobbs), and statutory reference to that remedy must, absent other indication, be deemed to contain the limitations upon its availability that equity typically imposes. Without this rule of construction, a statutory limitation to injunctive relief would be meaningless, since any claim for legal relief can, with lawyerly inventiveness, be phrased in terms of an injunction. Here, of course, there is not only no contrary indication, but the positive indication in paragraph (B) that the injunction referred to in paragraph (A) is an equitable injunction.

*Bowen* v. *Massachusetts, supra,* upon which petitioners rely, is not to the contrary. We held in *Bowen* that the provision of the Administrative Procedure Act that precludes actions seeking "money damages" against federal agencies, 5 U. S. C. § 702, does not bar a State from seeking specific relief to obtain money to which it claims entitlement under the federal Medicaid statute, 42 U. S. C. § 1396b(d) (1994 ed. and Supp. V). *Bowen* "did not turn on distinctions between 'equitable' actions and other actions . . . but rather [on] what Congress meant by 'other than money damages'" in the Administrative Procedure Act. *Department of Army* v. *Blue Fox, Inc.,* 525 U. S. 255, 261 (1999). Furthermore, *Bowen,* unlike petitioners' claim, did not deal with specific performance of a *contractual* obligation to pay *past* due sums. Rather, Massachusetts claimed not only that the Federal Government failed to reimburse it for past expenses pursuant to a statutory obligation, but that the method the Federal Government used to calculate reimbursements would lead to underpayments in the future. Thus, the suit was not merely for past due sums, but for an injunction to correct the method of calculating payments going forward. *Bowen, supra,* at 889. *Bowen* has no bearing on the unavailability of an injunction to enforce a contractual obligation to pay money past due.

B

Second, petitioners argue that their suit is authorized by § 502(a)(3)(B) because they seek restitution, which they characterize as a form of equitable relief. However, not all relief falling under the rubric of restitution is available in equity. In the days of the divided bench, restitution was available in certain cases at law, and in certain others in equity. See, *e. g.,* 1 Dobbs § 1.2, at 11; *id.,* § 4.1(1), at 556; *id.,* § 4.1(3), at 564–565; *id.,* §§ 4.2–4.3, at 570–624; 5 Corbin § 1102, at 550; Muir, ERISA Remedies: Chimera or Congressional Compromise?, 81 Iowa L. Rev. 1, 36–37 (1995); Redish, Seventh Amendment Right to Jury Trial: A Study in the Irrationality

of Rational Decision Making, 70 Nw. U. L. Rev. 486, 528 (1975). Thus, "restitution is a legal remedy when ordered in a case at law and an equitable remedy . . . when ordered in an equity case," and whether it is legal or equitable depends on "the basis for [the plaintiff's] claim" and the nature of the underlying remedies sought. *Reich* v. *Continental Casualty Co.*, 33 F. 3d 754, 756 (CA7 1994) (Posner, J.).

In cases in which the plaintiff "could *not* assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him," the plaintiff had a right to restitution *at law* through an action derived from the common-law writ of assumpsit. 1 Dobbs § 4.2(1), at 571. See also Muir, *supra*, at 37. In such cases, the plaintiff's claim was considered legal because he sought "to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money." Restatement of Restitution § 160, Comment *a*, pp. 641–642 (1936). Such claims were viewed essentially as actions at law for breach of contract (whether the contract was actual or implied).

In contrast, a plaintiff could seek restitution *in equity*, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession. See 1 Dobbs § 4.3(1), at 587–588; Restatement of Restitution, *supra*, § 160, Comment *a*, at 641–642; 1 G. Palmer, Law of Restitution § 1.4, p. 17; § 3.7, p. 262 (1978). A court of equity could then order a defendant to transfer title (in the case of the constructive trust) or to give a security interest (in the case of the equitable lien) to a plaintiff who was, in the eyes of equity, the true owner. But where "the property [sought to be recovered] or its proceeds have been dissipated so that no product remains, [the plaintiff's] claim is only that of a general creditor," and the plaintiff "cannot enforce a con-

structive trust of or an equitable lien upon other property of the [defendant]." Restatement of Restitution, *supra*, § 215, Comment *a*, at 867. Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.[2]

Here, the funds to which petitioners claim an entitlement under the Plan's reimbursement provision—the proceeds from the settlement of respondents' tort action—are not in respondents' possession. As the order of the state court approving the settlement makes clear, the disbursements from the settlement were paid by two checks, one made payable to the Special Needs Trust and the other to respondents' attorney (who, after deducting his own fees and costs, placed the remaining funds in a client trust account from which he tendered checks to respondents' other creditors, Great-West and Medi-Cal). The basis for petitioners' claim is not that respondents hold particular funds that, in good conscience, belong to petitioners, but that petitioners are contractually entitled to *some* funds for benefits that they conferred. The kind of restitution that petitioners seek, therefore, is not equitable—the imposition of a constructive trust or equitable lien on particular property—but legal—the imposition of personal liability for the benefits that they conferred upon respondents.

Admittedly, our cases have not previously drawn this fine distinction between restitution at law and restitution in equity, but neither have they involved an issue to which the

---

[2] There is a limited exception for an accounting for profits, a form of equitable restitution that is not at issue in this case. If, for example, a plaintiff is entitled to a constructive trust on particular property held by the defendant, he may also recover profits produced by the defendant's use of that property, even if he cannot identify a particular res containing the profits sought to be recovered. See 1 Dobbs § 4.3(1), at 588; *id.*, § 4.3(5), at 608. Petitioners do not claim the profits (if any) produced by the proceeds from the state-court settlement, and are not entitled to the constructive trust in those proceeds that would support such a claim.

distinction was relevant. In *Mertens*, we mentioned in dicta that "injunction, mandamus, and *restitution*" are categories of relief that were typically available in equity. 508 U. S., at 256 (emphasis added). *Mertens*, however, did not involve a claim for restitution at all; rather, we addressed the question whether a nonfiduciary who knowingly participates in the breach of a fiduciary duty imposed by ERISA is liable to the plan for compensatory damages. *Id.*, at 249–250. Thus, as courts and commentators have noted, "all the [Supreme] Court meant [in *Mertens* and other cases] was that restitution, in contrast to damages, is a remedy commonly ordered in equity cases and therefore an equitable remedy in a sense in which damages, though *occasionally* awarded in equity cases, are not." *Reich* v. *Continental Casualty Co.*, 33 F. 3d, at 756. *Mertens* did not purport to change the well-settled principle that restitution is "not an *exclusively* equitable remedy," and whether it is legal or equitable in a particular case (and hence whether it is authorized by § 502(a)(3)) remains dependent on the nature of the relief sought. 33 F. 3d, at 756. See also Muir, 81 Iowa L. Rev., at 36 (analyzing *Mertens* and explaining that "only equitable restitution will be available under Section 502(a)(3)").

Likewise, in *Harris Trust and Sav. Bank* v. *Salomon Smith Barney Inc.*, 530 U. S. 238 (2000), we noted that "an action for restitution against a transferee of tainted plan assets" is "appropriate equitable relief" within the meaning of § 502(a)(3). *Id.*, at 253. While we did not expressly distinguish between legal and equitable restitution, the nature of the relief we described in *Harris Trust*—a claim to specific property (or its proceeds) held by the defendant—accords with the restitution we describe as equitable today. *Id.*, at 250 ("The trustee or beneficiaries may then maintain an action for restitution *of the property* (if not already disposed of) or disgorgement *of proceeds* (if already disposed of) . . ." (emphasis added)); *id.*, at 250–251 ("Whenever the *legal title to property* is obtained through means or under

circumstances 'which render it unconscientious *for the holder of the legal title to retain and enjoy the beneficial interest*, equity impresses a constructive trust *on the property thus acquired* in favor of the one who is truly and equitably entitled to the same . . ." (emphasis added) (internal quotation marks and citations omitted)).

JUSTICE GINSBURG's dissent finds it dispositive that *some* restitutionary remedies were typically available in equity. In her view, the touchstone for distinguishing legal from equitable relief is the "substance of the relief requested," *post*, at 228—and since the "substantive" relief of restitution is typically available in equity, it is, she concludes, available under § 502(a)(3). It is doubtful, to begin with, that "restitution"—or at least restitution defined broadly enough to embrace those forms of restitution available at law—pertains to the *substance* of the relief rather than to the legal theory under which it is awarded. The "substance" of a money judgment is a compelled transfer of money; a money judgment *for restitution* could be thought to identify a particular *type* of relief (rather than merely the theory on which relief is awarded) only if one were to limit restitution to the return of identifiable funds (or property) belonging to the plaintiff and held by the defendant—that is, to limit restitution to the form of restitution traditionally available in equity.

In any event, JUSTICE GINSBURG's approach, which looks only to the nature of the relief and not to the conditions that equity attached to its provision, logically leads to the same untenable conclusion reached by JUSTICE STEVENS's dissent—which is that § 502(a)(3)(A)'s explicit authorization of injunction, which it identifies as a form of equitable relief, permits (what equity would never permit) an injunction against failure to pay a simple indebtedness—or, for that matter, an injunction against failure to pay punitive damages. The problem with that conclusion, of course, is that it renders the statute's limitation of relief to "[injunction] . . . or other appropriate equitable relief" utterly pointless. It

is easy to disparage the law-equity dichotomy as "an ancient classification," *post*, at 224 (opinion of GINSBURG, J.), and an "obsolete distinctio[n]," *post*, at 222 (opinion of STEVENS, J.). Like it or not, however, that classification and distinction has been specified by the statute; and there is no way to give the specification meaning—indeed, there is no way to render the unmistakable limitation of the statute a limitation *at all*— except by adverting to the differences between law and equity to which the statute refers. The dissents greatly exaggerate, moreover, the difficulty of that task. Congress felt comfortable referring to equitable relief in this statute—as it has in many others[3]—precisely because the basic contours of the term are well known. Rarely will there be need for any more "antiquarian inquiry," *post*, at 233–234 (opinion of GINSBURG, J.), than consulting, as we have done, standard current works such as Dobbs, Palmer, Corbin, and the Restatements, which make the answer clear. It is an inquiry, moreover, that we are accustomed to pursuing, and will always have to pursue, in other contexts. See, *e. g.*, *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308, 318 (1999) (powers of federal courts under the Judiciary Act's grant of jurisdiction over "all . . . suits in equity"); *Curtis* v. *Loether*, 415 U. S. 189, 192 (1974) (scope of the Seventh Amendment right to jury trial "[i]n suits at common law"). What *will* introduce a high degree of confusion into congressional use (and lawyers' understanding) of the statutory term "equity" is the rolling revision of its content contemplated by the dissents.

JUSTICE STEVENS finds it "difficult . . . to understand why Congress would not have wanted to provide recourse in federal court for the plan violation disclosed by the record in this case," *post*, at 223. It is, however, not our job to find reasons for what Congress has plainly done; and it *is* our job to avoid rendering what Congress has plainly done (here,

---

[3] A Westlaw search discloses that the term "equitable relief" appears in 77 provisions of the United States Code.

limit the available relief) devoid of reason and effect. If, as JUSTICE GINSBURG surmises, *post*, at 234, Congress meant to rule out nothing more than "compensatory and punitive damages," it could simply have said that. That Congress sought to achieve this result by subtle reliance upon the dissenters' novel and expansive view of equity is most implausible.

Respecting Congress's choice to limit the relief available under § 502(a)(3) to "equitable relief" requires us to recognize the difference between legal and equitable forms of restitution.[4] Because petitioners seek only the former, their suit is not authorized by § 502(a)(3).

---

[4] In support of its argument that Congress intended all restitution to be "equitable relief" under § 502(a)(3), JUSTICE GINSBURG's dissent asserts that Congress has treated backpay, "a type of restitution," *post*, at 230, as equitable for purposes of Title VII of the Civil Rights Act of 1964. The authorities of this Court cited for the proposition that backpay is a type of restitution are *Curtis* v. *Loether*, 415 U. S. 189, 197 (1974), and *Teamsters* v. *Terry*, 494 U. S. 558, 572 (1990). It is notable, however, that these cases do *not* say that *since* it is restitutionary, it is *therefore* equitable. *Curtis*, in fact, explicitly refuses to do so. 415 U. S., at 197 ("Whatever may be the merit of the 'equitable' characterization [of backpay] in Title VII cases . . ." (footnote omitted)). And in *Terry*, while we noted that "we have characterized damages as equitable where they are restitutionary," 494 U. S., at 570, we did not (and could not) say that *all* forms of restitution are equitable.

Congress "treated [backpay] as equitable" in Title VII, *post*, at 230 (opinion of GINSBURG, J.), only in the narrow sense that it allowed backpay to be awarded *together with* equitable relief:

"[T]he court may . . . order such affirmative action as may be appropriate, which may include, but is not limited to, *reinstatement or hiring of employees, with or without back pay* . . . , or any other equitable relief as the court deems appropriate." 42 U. S. C. § 2000e–5(g)(1) (1994 ed.) (emphasis added).

If the referent of "other equitable relief" were "back pay," it could be said, in a sense relevant here, that Congress "treated" backpay as equitable relief. In fact, however, the referent is "reinstatement or hiring of employees," which is modified by the phrase "with or without back pay." *Curtis* recognized that courts of appeals had treated Title VII backpay as

## C

Third, the United States, as petitioners' *amicus,* argues that the common law of trusts provides petitioners with equitable remedies that allow them to bring this action under § 502(a)(3). Analogizing respondents to beneficiaries of a trust, the United States argues that a trustee could bring a suit to enforce an agreement by a beneficiary to pay money into a trust or to repay an advance made from the trust. See Brief for United States as *Amicus Curiae* 17–19 (citing Restatement (Second) of Trusts §§ 252, 255 (1959) (hereinafter Restatement of Trusts)). These trust remedies are simply inapposite. In *Mertens,* we rejected the claim that the special equity-court powers applicable to trusts define the reach of § 502(a)(3). Instead, we held that the term "equitable relief" in § 502(a)(3) must refer to "those categories of relief that were *typically* available in equity . . . ." 508 U. S., at 256. In any event, the cited sections of the Restatement, by their terms, merely allow a trustee to charge the beneficiary's interest in the trust in order to capture money owed. See Restatement of Trusts § 252 ("If one of the bene-

equitable because § 2000e–5(g)(1) had made backpay "an integral part of an equitable remedy," 415 U. S., at 197. See *Grayson* v. *Wickes Corp.,* 607 F. 2d 1194, 1196 (CA7 1979) (Title VII backpay is "an integral part of the equitable remedy of reinstatement"); *Harmon* v. *May Broadcasting Co.,* 583 F. 2d 410, 411 (CA8 1978) (same); *Slack* v. *Havens,* 522 F. 2d 1091, 1094 (CA9 1975) (same); *Johnson* v. *Georgia Highway Express, Inc.,* 417 F. 2d 1122, 1125 (CA5 1969) (same).

The statement in *Terry* on which JUSTICE GINSBURG relies—that "Congress specifically characterized backpay under Title VII as a form of 'equitable relief,'" 494 U. S., at 572—is plainly inaccurate unless it is understood to mean that Title VII backpay was "specifically" made part of an equitable remedy. That is the only sense which the *Terry* discussion requires, and is reinforced by the immediately following citation of the portion of *Curtis* that called Title VII backpay "an integral part of an equitable remedy," *Curtis, supra,* at 197. See *Terry, supra,* at 572. The restitution sought here by Great-West is not that, but a freestanding claim for money damages. Title VII has nothing to do with this case.

ficiaries of a trust contracts to pay money to the trustee to be held as part of the trust estate and he fails to make the payment, his beneficial interest is subject to a charge for the amount of his liability"); *id.*, § 255 ("If the trustee makes an advance or loan of trust money to a beneficiary, the beneficiary's interest is subject to a charge for the repayment of the amount advanced or lent"). These setoff remedies do not give the trustee a separate equitable cause of action for payment from other moneys.

## III

In the end, petitioners ask us to interpret § 502(a)(3) so as to prevent them "from being deprived of any remedy under circumstances where such a result clearly would be inconsistent with a primary purpose of ERISA," namely, the enforcement of the terms of a plan. See Brief for Petitioners 30–31. We note, though it is not necessary to our decision, that there may have been other means for petitioners to obtain the essentially legal relief that they seek. We express no opinion as to whether petitioners could have intervened in the state-court tort action brought by respondents or whether a direct action by petitioners against respondents asserting state-law claims such as breach of contract would have been pre-empted by ERISA. Nor do we decide whether petitioners could have obtained equitable relief against respondents' attorney and the trustee of the Special Needs Trust, since petitioners did not appeal the District Court's denial of their motion to amend their complaint to add these individuals as codefendants.

We need not decide these issues because, as we explained in *Mertens*, "[e]ven assuming . . . that petitioners are correct about the pre-emption of previously available state-court actions" or the lack of other means to obtain relief, "vague notions of a statute's 'basic purpose' are nonetheless inadequate to overcome the words of its text regarding the *specific* issue under consideration." 508 U. S., at 261. In the

very same section of ERISA as § 502(a)(3), Congress author-
ized "a participant or beneficiary" to bring a civil action
"to enforce his rights under the terms of the plan," without
reference to whether the relief sought is legal or equitable.
29 U. S. C. § 1132(a)(1)(B) (1994 ed.). But Congress did
not extend the same authorization to fiduciaries. Rather,
§ 502(a)(3), by its terms, only allows for *equitable* relief. We
will not attempt to adjust the "carefully crafted and detailed
enforcement scheme" embodied in the text that Congress has
adopted.[5] *Mertens, supra,* at 254. Because petitioners are
seeking legal relief—the imposition of personal liability on
respondents for a contractual obligation to pay money—
§ 502(a)(3) does not authorize this action. Accordingly, we
affirm the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

In her lucid dissent, which I join, JUSTICE GINSBURG has
explained why it is fanciful to assume that in 1974 Congress

---

[5] *Varity Corp.* v. *Howe,* 516 U. S. 489 (1996), upon which petitioners rely,
is not to the contrary. In *Varity Corp.,* we explained that § 502(a)(3) is
a "'catchall' provisio[n]" that "act[s] as a safety net, offering appropri-
ate equitable relief for injuries caused by violations that § 502 does not
elsewhere adequately remedy." *Id.,* at 512. Thus, we concluded that
§ 502(a)(3) authorizes lawsuits by beneficiaries for individualized equitable
relief for breach of fiduciary obligations, notwithstanding the petitioner's
argument that such relief is not "appropriate" because §§ 502(a)(2) and 409
of ERISA specifically address liability for breach of fiduciary duty and
preclude individualized relief. *Id.,* at 507–515. In *Varity Corp.,* however,
it was undisputed that respondents were seeking *equitable* relief, and the
question was whether such relief was "appropriate" in light of the appar-
ent lack of alternative remedies. *Id.,* at 508. *Varity Corp.* did not hold,
as petitioners urge us to conclude today, that § 502(a)(3) is a catchall provi-
sion that authorizes *all* relief that is consistent with ERISA's purposes
and is not explicitly provided elsewhere. To accept petitioners' argument
is to ignore the plain language of the statute, which provides fiduciaries
with only equitable relief.

intended to revive the obsolete distinctions between law and equity as a basis for defining the remedies available in federal court for violations of the terms of a plan under the Employee Retirement Income Security Act of 1974 (ERISA). She has also convincingly argued that the relief sought in the present case is permissible even under the Court's favored test for determining what qualifies as "equitable relief" under § 502(a)(3)(B) of ERISA. I add this postscript because I am persuaded that Congress intended the word "enjoin," as used in § 502(a)(3)(A), to authorize any appropriate order that prohibits or terminates a violation of an ERISA plan, regardless of whether a precedent for such an order can be found in English Chancery cases.

I read the word "other" in § 502(a)(3)(B) as having been intended to enlarge, not contract, a federal judge's remedial authority. Consequently, and contrary to the Court's view in *Mertens v. Hewitt Associates*, 508 U. S. 248, 256 (1993), I would neither read § 502(a)(3)(B) as placing a *limitation* on a judge's authority under § 502(a)(3)(A), nor shackle an analysis of what constitutes "equitable relief" under § 502(a)(3)(B) to the sort of historical analysis that the Court has chosen.

Nevertheless, *Mertens* is the law, and an inquiry under § 502(a)(3)(B) now entails an analysis of what relief would have been "*typically* available in equity." 508 U. S., at 256. This does not mean, however, that all inquiries under § 502(a)(3) must involve historical analysis, as the Court seems to believe, *e. g., ante,* at 209–210. In *Mertens,* our task was to interpret "other appropriate equitable relief" under § 502(a)(3)(B), and our holding thus did not extend to the meaning of "to enjoin" in § 502(a)(3)(A). As a result, an analysis of tradition is unnecessary with respect to § 502(a)(3)(A). Moreover, that section provides a proper basis for federal jurisdiction in the present case, as petitioners brought suit "to enjoin any act or practice which violates . . . the terms of [a] plan." § 502(a)(3)(A).

Not only is an inclusive reading of § 502(a)(3) consonant with the text of the statute, but it accomplishes Congress' goal of providing a federal remedy for violations of the terms of plans governed by ERISA. Contrary to the Court's current reluctance to conclude that wrongs should be remedied,[1] I believe that the historic presumption favoring the provision of remedies for violations of federal rights[2] should inform our construction of the remedial provisions of federal statutes. It is difficult for me to understand why Congress would not have wanted to provide recourse in federal court for the plan violation disclosed by the record in this case. Cf., *e. g.*, *Varity Corp.* v. *Howe*, 516 U. S. 489, 512–513, 515 (1996) ("We are not aware of any ERISA-related purpose that denial of a remedy would serve"). It is thus unsurprising that the Court's opinion contains no discussion of why Congress would have intended its reading of § 502(a)(3) and the resulting denial of a federal remedy in this case. Absent such discussion, the Court's opinion is remarkably unpersuasive.[3]

I respectfully dissent.

---

[1] See, *e. g.*, *Correctional Services Corp.* v. *Malesko, ante*, p. 75 (STEVENS, J., dissenting); *Alexander* v. *Sandoval*, 532 U. S. 275, 294–297 (2001) (STEVENS, J., dissenting).

[2] See, *e. g.*, *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388, 392 (1971) ("'[W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief'" (quoting *Bell* v. *Hood*, 327 U. S. 678, 684 (1946))); 403 U. S., at 397 ("'The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury'" (quoting *Marbury* v. *Madison*, 1 Cranch 137, 163 (1803))).

[3] In a response to this dissent that echoes Tennyson's poem about the Light Brigade—"Theirs not to reason why, Theirs but to do and die"—the Court states that it is "not our job to find reasons for what Congress has plainly done," *ante*, at 217. Congress, of course, has the power to enact unreasonable laws. Nevertheless, instead of blind obedience to what at first blush appears to be such a law, I think it both prudent and respectful to pause to ask why Congress would do so.

JUSTICE GINSBURG, with whom JUSTICE STEVENS, JUS-
TICE SOUTER, and JUSTICE BREYER join, dissenting.

Today's holding, the majority declares, is compelled by
"Congress's choice to limit the relief available under
§ 502(a)(3)." *Ante*, at 218. In the Court's view, Congress'
placement of the word "equitable" in that provision signaled
an intent to exhume the "fine distinction[s]" borne of the
"days of the divided bench," *ante*, at 212, 214; to treat as dis-
positive an ancient classification unrelated to the substance of
the relief sought; and to obstruct the general goals of ERISA
by relegating to state court (or to no court at all) an array
of suits involving the interpretation of employee health plan
provisions. Because it is plain that Congress made no such
"choice," I dissent.

I

The Court purports to resolve this case by determining
the "nature of the relief" Great-West seeks. *Ante*, at 215.
The opinion's analysis, however, trains on the question,
deemed subsidiary, whether the disputed claim could have
been brought in an equity court "[i]n the days of the divided
bench." *Ante*, at 212–216 (inquiring whether the claim is
akin to "an action derived from the common-law writ of as-
sumpsit" that would have been brought at law, or instead
resembles a claim for return of particular assets that would
"lie in equity"). To answer that question, the Court scruti-
nizes the form of the claim and contrasts its features with the
technical requirements that once governed the jurisdictional
divide between the premerger courts. Finding no clear
match on the equitable side of the line, the Court concludes
that Great-West's claim is beyond the scope of § 502(a)(3) and
therefore outside federal jurisdiction.

The rarified rules underlying this rigid and time-bound
conception of the term "equity" were hardly at the fingertips
of those who enacted § 502(a)(3). By 1974, when ERISA be-
came law, the "days of the divided bench" were a fading
memory, for that era had ended nearly 40 years earlier with

the advent of the Federal Rules of Civil Procedure. Those rules instruct: "There shall be one form of action" cognizable in the federal courts. Fed. Rule Civ. Proc. 2. Except where reference to historical practice might be necessary to preserve a right established before the merger, see, *e. g.*, *Curtis* v. *Loether*, 415 U. S. 189, 195 (1974) (Seventh Amendment jury trial), the doctrinal rules delineating the boundaries of the divided courts had receded. See 4 C. Wright & A. Miller, Federal Practice and Procedure § 1041, p. 135 (1987); C. Wright, Handbook on Law of Federal Courts § 67, p. 282 (2d ed. 1970) ("[I]nstances in which the old distinctions continue to rule from their graves are quite rare.").

It is thus fanciful to attribute to Members of the 93d Congress familiarity with those "needless and obsolete distinctions," 4 Wright & Miller, *supra*, § 1041, at 131, much less a deliberate "choice" to resurrect and import them wholesale into the modern regulatory scheme laid out in ERISA. "[T]here is nothing to suggest that ERISA's drafters wanted to embed their work in a time warp." *Health Cost Controls of Ill.* v. *Washington*, 187 F. 3d 703, 711 (CA7 1999) (Posner, J.); cf. *Mertens* v. *Hewitt Associates*, 508 U. S. 248, 257, n. 7 (1993) (meaning of "equitable relief" in § 502(a)(3) must be determined based on "the state of the law when ERISA was enacted").

That Congress did not intend to strap § 502(a)(3) with the anachronistic rules on which the majority relies is corroborated by the anomalous results to which the supposed legislative "choice" leads. Although the Court recognizes that it need not decide the issue, see *ante*, at 220, its opinion surely contemplates that a constructive trust claim would lie; hence, the outcome of this case would be different if Great-West had sued the trustee of the Special Needs Trust, who has "possession" of the requested funds, instead of the Knudsons, who do not. See *ante*, at 214 (constructive trust unavailable because "the funds to which petitioners claim an entitlement . . . are not in respondents' possession"). Under

that view, whether relief is "equitable" would turn entirely on the designation of the defendant, even though the substance of the relief Great-West could have obtained in a suit against the trustee—a judgment ordering the return of wrongfully withheld funds—is identical to the relief Great-West in fact sought from the Knudsons. Unlike today's majority, I resist this "rule unjustified in reason, which produces different results for breaches of duty in situations that cannot be differentiated in policy." *Moragne* v. *States Marine Lines, Inc.*, 398 U. S. 375, 405 (1970).

The procedural history of this case highlights the anomaly of upholding a judgment neither party supports,[1] one that will at least protract and perhaps preclude judicial resolution of the nub of the controversy—*i. e.*, what recoupment does the Plan's reimbursement provision call for. Great-West named the Knudsons as defendants before Janet Knudson's Special Needs Trust had been approved. There was no other defendant then in the picture. Seeking at that time to preserve the status quo, Great-West requested from the District Court preliminary injunctive relief to stop the Knudsons from disposing of the funds Hyundai paid to settle the state-court action. Only after the District Court denied that relief did the state court approve of, and order that the settlement funds be paid into, the Special Needs Trust. Great-West then moved for leave to amend its complaint to add the trustee as a defendant, but the District Court denied

---

[1] In the District Court, both parties sought decision on the amount Great-West was entitled to recoup under the Plan's provision for recovery of benefits paid, and the court resolved that issue in the Knudsons' favor. The Ninth Circuit, however, refused to review the District Court's resolution of that question, holding instead that federal courts are without authority to grant any relief to parties in Great-West's situation. Because neither party defended that ruling in this Court, Motion to Dismiss as Improvidently Granted 1, we appointed an *amicus curiae* to argue in support of the Ninth Circuit's judgment. See 532 U. S. 917 (2001). Both on brief and at oral argument, appointed counsel commendably developed the position the majority now adopts.

that motion without consideration in light of its judgment for the Knudsons on the merits. Had the District Court ruled differently on this peripheral issue, the majority would presumably reverse rather than affirm a disposition of this case that left in limbo the meaning of the Plan's reimbursement provision. If that is so, then the Court's decision rests on Great-West's failure to appeal an interlocutory issue made moot by the District Court's final judgment, an issue that, to all involved, must have seemed utterly inconsequential post judgment day.

The majority's avowed obedience to Congress' "choice" is further belied by the conflict between the Court's holding and Congress' stated goals in enacting ERISA. After today, ERISA plans and fiduciaries unable to fit their suits within the confines the Court's opinion constructs are barred from a federal forum; they may seek enforcement of reimbursement provisions like the one here at issue only in state court. Many such suits may be precluded by antisubrogation laws, see Brief for Maryland HMO Subrogation Plaintiffs as *Amici Curiae* 4–5, n. 2, others may be preempted by ERISA itself, and those that survive may produce diverse and potentially contradictory interpretations of the disputed plan terms.

We have recognized that Congress sought through ERISA "to establish a uniform administrative scheme" and to ensure that plan provisions would be enforced in federal court, free of "the threat of conflicting or inconsistent State and local regulation." *Fort Halifax Packing Co.* v. *Coyne*, 482 U. S. 1, 9 (1987) (internal quotation marks omitted) (quoting 120 Cong. Rec. 29933 (1974)). The majority's construction frustrates those goals by ascribing to Congress the paradoxical intent to enact a specific provision, §502(a)(3), that thwarts the purposes of the general scheme of which it is part. The Court is no doubt correct that "vague notions of a statute's 'basic purpose' are . . . inadequate to overcome the words of its text regarding the specific issue under consideration."

*Ante,* at 220 (quoting *Mertens,* 508 U. S., at 261) (emphasis deleted). But when Congress' clearly stated purpose so starkly conflicts with questionable inferences drawn from a single word in the statute, it is the latter, and not the former, that must give way.

It is particularly ironic that the majority acts in the name of equity as it sacrifices congressional intent and statutory purpose to archaic and unyielding doctrine. "Equity eschews mechanical rules; it depends on flexibility." *Holmberg* v. *Armbrecht,* 327 U. S. 392, 396 (1946). And "[a]s this Court long ago recognized, 'there is inherent in the Courts of Equity a jurisdiction to . . . give effect to the policy of the legislature.'" *Mitchell* v. *Robert DeMario Jewelry, Inc.,* 361 U. S. 288, 291–292 (1960) (quoting *Clark* v. *Smith,* 13 Pet. 195, 203 (1839)); see *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 417 (1975) ("[W]hen Congress invokes the Chancellor's conscience to further transcendent legislative purposes, what is required is the principled application of standards consistent with those purposes."); cf. *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.,* 527 U. S. 308, 336 (1999) (GINSBURG, J., dissenting) (Court similarly "relie[d] on an unjustifiably static conception of equity jurisdiction").

## II

Unprepared to agree that Congress chose to infuse § 502(a)(3) with the recondite distinctions on which the majority relies, I would accord a different meaning to the term "equitable." Consistent with what Congress likely intended and with our decision in *Mertens,* I would look to the substance of the relief requested and ask whether relief of that character was *"typically* available in equity." *Mertens,* 508 U. S., at 256. Great-West seeks restitution, a category of relief fully meeting that measure even if the remedy was also available in cases brought at law. Accordingly, I would not oust this case from the federal courts.

That Great-West requests restitution is beyond dispute. The relief would operate to transfer from the Knudsons funds over which Great-West claims to be the rightful owner. See *Curtis*, 415 U. S., at 197 (describing an award as restitutionary if it would "requir[e] the defendant to disgorge funds wrongfully withheld from the plaintiff"); *Porter* v. *Warner Holding Co.*, 328 U. S. 395, 402 (1946) (restitution encompasses a decree "ordering the return of that which rightfully belongs to" the plaintiff). Great-West alleges that the Knudsons would be unjustly enriched if permitted to retain the funds. See 1 D. Dobbs, Law of Remedies § 4.1(2), p. 557 (2d ed. 1993) ("The fundamental substantive basis for restitution is that the defendant has been unjustly enriched by receiving something, tangible or intangible, that properly belongs to the plaintiff."). And Great-West sued to recover an amount representing the Knudsons' unjust gain, rather than Great-West's loss. See 3 *id.*, § 12.1(1), at 9 ("Restitutionary recoveries are based on the defendant's gain, not on the plaintiff's loss.").

As the majority appears to admit, see *ante*, at 214, our cases have invariably described restitutionary relief as "equitable" without even mentioning, much less dwelling upon, the ancient classifications on which today's holding rests. See, *e. g., Tull* v. *United States*, 481 U. S. 412, 424 (1987) (restitution "traditionally considered an equitable remedy"); *Mertens*, 508 U. S., at 255 (restitution is a "remedy traditionally viewed as 'equitable'"); *Teamsters* v. *Terry*, 494 U. S. 558, 570 (1990) ("[W]e have characterized [money] damages as equitable where they are restitutionary."); *Mitchell*, 361 U. S., at 291–293 (District Court could exercise equitable authority under Fair Labor Standards Act to order restitution); cf. *Moses* v. *Macferlan*, 2 Burr. 1005, 1012, 97 Eng. Rep. 676, 681 (K. B. 1760) ("In one word, the gist of this kind of action is that the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money."). These cases establish what the Court does not

and cannot dispute: Restitution was "within the recognized power and within the highest tradition of a court of equity." *Porter*, 328 U. S., at 402.

More important, if one's concern is to follow the Legislature's will, Congress itself has treated as equitable a type of restitution substantially similar to the relief Great-West seeks here. Congress placed in Title VII of the Civil Rights Act of 1964 the instruction that, to redress violations of the Act, courts may award, *inter alia,* "appropriate . . . equitable relief," including "reinstatement or hiring of employees, with or without back pay." 42 U. S. C. § 2000e–5(g)(1) (1994 ed.). Interpreting this provision, we have recognized that backpay is "a form of restitution," *Curtis*, 415 U. S., at 197; see *Terry,* 494 U. S., at 572, and that "Congress specifically characterized backpay under Title VII as a form of 'equitable relief,'" *ibid.* The *Mertens* majority used Title VII's "equitable relief" provision as the touchstone for its interpretation of § 502(a)(3), see 508 U. S., at 255; today's majority declares, with remarkable inconsistency, that "Title VII has nothing to do with this case," *ante,* at 219, n. 4. The Court inexplicably fails to offer any reason why Congress did not intend "equitable relief" in § 502(a)(3) to include a plaintiff's "recover[y of] money to pay for some benefit the defendant had received from him," *ante,* at 213 (internal quotation marks omitted), but did intend those words to encompass such relief in a measure (Title VII) enacted years earlier.[2]

---

[2] The Courts of Appeals have not aligned behind the Court's theory that Congress treated Title VII backpay as equitable "only in the narrow sense that" such relief is an "integral part" of the statutory remedy of reinstatement. *Ante,* at 218, n. 4. While some courts have employed the majority's rationale, others have adopted the position the Court denies: that Title VII backpay is restitutionary and *"therefore* equitable," *ibid.* See, *e. g., EEOC* v. *Detroit Edison Co.,* 515 F. 2d 301, 308 (CA6 1975) ("Back pay in Title VII cases is considered a form of restitution, not an award of damages. Since restitution is an equitable remedy a jury is not required for the award of back pay."), vacated on other grounds, 431 U. S. 951 (1977); *Rogers* v. *Loether,* 467 F. 2d 1110, 1121 (CA7 1972) ("It is not unreasonable

I agree that "not *all* relief falling under the rubric of restitution [was] available in equity," *ante,* at 212 (emphasis added); restitution was also available in claims brought at law, and the majority may be correct that in such cases restitution would have been termed "legal," *ante,* at 213. But that in no way affects the answer to the question at the core of this case. Section 502(a)(3) as interpreted in *Mertens* encompasses those "categories of relief that were *typically* available in equity," 508 U. S., at 256 (emphasis in original), not those that were *exclusively* so. Restitution plainly fits that bill. By insisting that § 502(a)(3) embraces only those *claims* that, in the circumstances of the particular case, could be brought in chancery in times of yore, the majority labors against the holding of that case. Indeed, *Mertens* explicitly

---

to regard an award of back pay [under Title VII] as an appropriate exercise of a chancellor's power to require restitution. Restitution is clearly an equitable remedy." (footnote omitted)), aff'd, 415 U. S. 189 (1974). See also *Hubbard* v. *EPA,* 949 F. 2d 453, 462 (CADC 1991) ("Courts have recognized the equitable nature of back pay awards in a number of different contexts. Generally, these decisions hold that back pay constitutes the very thing that the plaintiff would have received but for the defendant's illegal action; back pay is thus seen to reflect equitable restitution."), aff'd on other grounds, 982 F. 2d 531 (CADC 1992) (en banc).

Such a reading of § 2000e–5(g)(1) accords with our recognition in *Teamsters* v. *Terry,* 494 U. S. 558, 572 (1990), that "Congress specifically characterized *backpay* under Title VII as a form of 'equitable relief.'" (Emphasis added.) We were somewhat ambiguous in *Curtis* v. *Loether,* 415 U. S. 189, 197 (1974), about the rationale of the Courts of Appeals, reasoning that they had treated Title VII backpay as equitable because Congress had made backpay "an integral part of an equitable remedy, a form of restitution." But we spoke with greater clarity in *Terry,* 494 U. S., at 570–571, explaining that we could find an "exception to the general rule" that monetary relief is legal, rather than equitable, in two situations: *either* "where th[e relief is] restitutionary," a category into which we suggested Title VII backpay might fall, see *id.,* at 572 ("backpay sought from an employer under Title VII would generally be restitutionary in nature"); *or* where "a monetary award [is] 'incidental to or intertwined with injunctive relief,'" *id.,* at 571 (quoting *Tull* v. *United States,* 481 U. S. 412, 424 (1987)).

rejected a position close to the one embraced by the Court today; *Mertens* recognized that "[a]s memories of the divided bench, and familiarity with its technical refinements, recede further into the past, [an interpretation of § 502(a)(3) keyed to the relief a court of equity could award in a particular case] becomes, perhaps, increasingly unlikely." 508 U. S., at 256–257.

My objection to the inquiry the Court today adopts in spite of *Mertens* does not turn on "the difficulty of th[e] task," *ante*, at 217. To be sure, I question the Court's confidence in the ability of "the standard works" to "make the answer clear"; the Court does not indicate what rule prevails, for example, when those works conflict, as they do on key points, compare Restatement of Restitution § 160, Comment *e*, p. 645 (1936) (constructive trust over money available only where transfer procured by abuse of fiduciary relation or where legal remedy inadequate), with 1 Dobbs, Law of Remedies § 4.3(2), at 595, 597 (limitation of constructive trust to "misdealings by fiduciaries" a "misconception"; adequacy of legal remedy "seems irrelevant"). And courts have recognized that this Court's preferred method is indeed "difficult to apply," *Ross* v. *Bernhard*, 396 U. S. 531, 538, n. 10 (1970), calling for analysis that "may seem to reek unduly of the study," *Damsky* v. *Zavatt*, 289 F. 2d 46, 48 (CA2 1961) (Friendly, J.), "'if not of the museum,'" *id.*, at 59 (Clark, J., dissenting).

Even if the Court's chosen texts always yielded a quick and plain answer, however, I would think it no less implausible that Congress intended to make controlling the doctrine those texts describe. See *supra*, at 224–228. Our reliance on that doctrine in the context of the Seventh Amendment and Judiciary Act of 1789, see *ante*, at 217, underscores the incongruity of applying it here. It may be arguable that "preserving" the meaning of those founding-era provisions requires courts to determine which tribunal would have entertained a particular claim in 18th-century England. See

*Grupo Mexicano,* 527 U. S., at 318–319; *Terry,* 494 U. S., at 593 (KENNEDY, J., dissenting) ("We cannot preserve a right existing in 1791 unless we look to history to identify it."). But no such rationale conceivably justifies asking that question in cases arising under § 502(a)(3)(B), a provision of a distinctly modern statute Congress passed in 1974.

That the import of the term "equity" might depend on context does not signify a "rolling revision of its content," *ante,* at 217, but rather a recognition that equity, characteristically, was and should remain an evolving and dynamic jurisprudence, see *Grupo Mexicano,* 527 U. S., at 336–337 (GINSBURG, J., dissenting). Cf. *Mertens,* 508 U. S., at 257 ("[I]t remains a question of interpretation in each case which meaning [Congress] intended" to impart to the term "equitable relief."). As courts in the common-law realm have reaffirmed: "Principles of equity, we were all taught, were introduced by Lord Chancellors and their deputies . . . in order to provide relief from the inflexibility of common law rules." *Medforth* v. *Blake,* [1999] 3 All E. R. 97, 110 (C. A.); see *Boulting* v. *Association of Cinematograph, Television and Allied Technicians,* [1963] 2 Q. B. 606, 636 (C. A.) ("[A]ll rules of equity [are] flexible, in the sense that [they] develo[p] to meet the changing situations and conditions of the time."); *Pettkus* v. *Becker,* [1980] 2 S. C. R. 834, 847, 117 D. L. R. (3d) 257, 273 ("The great advantage of ancient principles of equity is their flexibility: the judiciary is thus able to shape these malleable principles so as to accommodate the changing needs and mores of society."). This Court's equation of "equity" with the rigid application of rules frozen in a bygone era, I maintain, is thus "unjustifiabl[e]" even as applied to a law grounded in that era. *Grupo Mexicano,* 527 U. S., at 336 (GINSBURG, J., dissenting). As applied to a statute like ERISA, however, such insistence is senseless.

Thus, there is no reason to ask what court would have entertained Great-West's claim "[i]n the days of the divided bench," *ante,* at 212, and no need to engage in the antiquar-

ian inquiry through which the majority attempts to answer that question. Nor would reading § 502(a)(3) to encompass restitution render the modifier "equitable" "utterly pointless," as the Court fears, *ante*, at 216. Such a construction would confine the scope of that provision to significantly "less than *all* relief," *ante*, at 209 (quoting *Mertens*, 508 U. S., at 258, n. 8). Most notably, it would exclude compensatory and punitive damages, see *id.*, at 255, which, "though *occasionally* awarded in equity" under the "clean up doctrine," *Reich* v. *Continental Casualty Co.*, 33 F. 3d 754, 756 (CA7 1994), were not typically available in such courts. See 1 S. Symons, Pomeroy's Equity Jurisprudence § 181, p. 257 (5th ed. 1941). That large limitation is indeed "unmistakable." But cf. *ante*, at 217. In sum, the reading I would adopt is entirely faithful to the core holding of *Mertens:* "[E]quitable relief" in § 502(a)(3) "refer[s] to those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." 508 U. S., at 256.

\* \* \*

Today's decision needlessly obscures the meaning and complicates the application of § 502(a)(3). The Court's interpretation of that provision embroils federal courts in "recondite controversies better left to legal historians," *Terry*, 494 U. S., at 576 (Brennan, J., concurring in part and concurring in judgment), and yields results that are demonstrably at odds with Congress' goals in enacting ERISA. Because in my view Congress cannot plausibly be said to have "carefully crafted" such confusion, *ante*, at 221, I dissent.