**Sean Alan NELSON, Plaintiff,**

v.

**NIELSEN MEDIA RESEARCH, INC. Defendant.**

**No. 02 CIV. 1222.**

United States District Court, S.D. New York.

Dec. 12, 2002.

Aimee B. Meltzer, Orrick, Herrington & Sutcliffe LLP, New York City, for Plaintiff.

Sean Alan Nelson, Scotoch Plains, NJ, Pro se.

Robert S. Whitman, Aimee Meltzer Florin, Orrick, Herrington & Sutcliffe, L.L.P., New York City, for Defendant.

## DECISION AND AMENDED ORDER

MARRERO, District Judge.

Plaintiff Sean Alan Nelson ("Nelson") brought this action against defendant Nielsen Media Research, Inc. ("Nielsen") seeking compensation in the form of severance pay pursuant to an employee benefits plan sponsored by Nielsen that is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"). Nelson's claim for such payment was denied by Nielsen's Employee Benefit Committee.

Nielsen moved for summary judgment to dismiss Nelson's amended complaint. By Order dated November 27, 2002 the Court granted the motion, and indicated that the reasoning for its judgment would be set forth in a separate decision. For

the reasons discussed below, Nielsen's motion for summary judgment is GRANTED.

## I. FACTS

Nelson was employed by Nielsen in July 2000 to work in the company's Human Resources Department as a Human Resource Business Partner reporting to Anita Rubino ("Rubino"), Nielsen's Senior Vice President for Human Resources. Following a discussion on May 9, 2001 with Jacki DeFilippo ("DeFilippo"), a Nielsen Business Partner with whom Nelson worked, Rubino met with Nelson on May 11, 2001 to discuss termination of his employment, allegedly related to incidents of inappropriate and offensive behavior by Nelson. Rubino stated that she had planned to discharge Nelson immediately but decided not to do so at that time. Instead, as had been proposed to her by DeFilippo, Rubino offered Nelson an opportunity to remain on the payroll working part-time on special projects at full salary so as to enable Nelson to find other employment without a loss of income. Rubino also agreed to provide Nelson with outplacement services. According to Nielsen, Rubino proposed that Nelson continue working on these terms through mid-July and officially resign effective August 31, 2001. This accommodation was to be in lieu of any severance pay package Nelson would otherwise receive under the company's Career Transition Plan (the "CTP" or the "Plan").[1]

Nelson offers a different version of the May 11 conversation. He maintains that Rubino agreed that he was to remain employed until the termination date, following which he would leave by "mutual separation" as defined in the CTP and be entitled to corresponding benefits.

Following the meeting, Nelson prepared a resignation letter dated May 11, 2001, recording his account of the agreement by which he would resign on the sooner of the date of the completion of his special projects, or August 31, 2001, and the parties would consider his termination a mutual separation entitling Nelson to CTP severance benefits. Nelson contends that, while Rubino did not sign his May 11 letter of resignation, she reaffirmed Nelson's understanding of their agreement at a subsequent meeting on May 23, 2001 in which Betsy Williams ("Williams"), another Nielsen Human Resources officer, participated. At that meeting, according to Nelson, Rubino stated that she had declined to sign his letter of resignation, although acknowledging her acceptance of its contents, not because she disagreed with the terms but because she did not want to make the matter that formal.

Nielsen, on the other hand, asserts that Rubino refused to countersign Nelson's letter because it misrepresented their agreement concerning Nelson's termination. Specifically, Nielsen contends that Rubino's offer to Nelson enabled him to remain on the payroll at full pay while

---

1. Under the Plan, certain Nielsen employees were entitled to receive severance pay in the event of an "eligible termination" of their employment, defined as involuntary resignation pursuant to a company reduction-in-force, job elimination or unsatisfactory performance, or a "mutual separation", defined as a resignation mutually agreed to in writing by the company and the employee. (*See* Nielsen Media Research, Inc. Career Transition Plan ¶ 1.9, attached as Ex. A of Declaration of

Laurie Farrell, dated September 27, 2002 ("Farrell Decl."), annexed to Defendant's Statement of Material Facts Required by Local Civil Rule 56.1, dated September 27, 2002.) The amount of any severance paid under the Plan varies in accordance with the reason for termination, the employee's salary and length of service, and the award is conditioned upon the employee executing a release of claims against Nielsen. *See id.* at ¶ 1.13.

**316**

working part-time in lieu of receiving any severance payments under the CTP.

On July 9, 2001, days before his projected termination date of July 15, Nelson sent a second official letter of resignation to Rubino. In it, he stated that his last day of employment would be July 15 and repeated his view that his departure would be deemed a mutual separation as defined in the CTP. Rubino again refused to endorse Nelson's July 9th letter. In response she met with Nelson on July 12. At that time Rubino informed Nelson that his employment was terminated immediately and offered him two options: to reaffirm his resignation with an effective date of August 31, 2001 and remain on the payroll until then, without any CTP benefits, or accept a termination for poor performance and receive a CTP package calculated on that basis. Rubino later consulted Susan Allen ("Allen"), a Nielsen Assistant General Counsel, who confirmed that under her interpretation of the Plan, Nelson was not entitled to a CTP severance on the facts presented.

Following the July 12th meeting, Nelson did not respond to the two options Rubino had offered and was then removed from the payroll. In a letter to Allen dated July 20, 2001, Nelson reiterated his position that his tendering a resignation on May 11 was conditioned on Rubino's having agreed that the termination would be treated as a mutual separation under the CTP and that Rubino's failure to respond to his letter constituted a waiver of objections. Allen responded on July 31 challenging Nelson's characterization of Rubino's proposals as expressing Nielsen's commitment to pay Plan benefits commencing after July 13,

2001 by mutual agreement. The letter concluded: "You received no assurance that the resignation letter you chose to offer would entitle you to any CTP plan benefits whatsoever, and we continue to decline to pay them." (Farrell Decl. Ex. B.8 at NMR 052.)

Nelson communicated with Allen by telephone message in early August, stating that he had not been paid on July 31 and that he had expected to remain on the payroll through August 31. Allen replied that Nelson had been removed from the payroll because of his failure to respond to the two options presented in Rubino's letter of July 12. Nelson then sent an e-mail to Rubino and Allen on August 6. There he restated that by means of his May 11 letter he had resigned effective August 31; he also demanded his wages through that date. In response, Allen advised Nelson that he would be restored to the payroll and paid in full through August 31.

On October 4, 2001 Nelson filed a formal request for CTP severance benefits. (See id. Ex. B.11.) It was submitted to Laurie Farrell ("Farrell"), a Nielsen Vice President responsible for administering benefit plans and a member of the company's Employee Benefits Committee (the "Committee").[2] In essence, Nelson claimed that on the basis of his resignation effective as of July 15, he was entitled to a total of thirteen weeks of severance, carrying him through October 12. On this view, because he had been paid through August 31, Nelson asserted that he was still owed an additional seven weeks of wages. As explanation for his claim, Nelson stated that:

> [Rubino] made an agreement with me and upon notice that she had clearly

---

2. The CTP designates the Committee as administrator of the Plan and grants it "the exclusive right, power and authority" to interpret the Plan's provisions, as well as consider and decide "any questions (whether of fact or otherwise) arising in connection with the administration of the Plan or any claims for severance benefits arising under the Plan." (Id. at Ex. A. ¶ 4.1.)

mis-interpreted the CTP, she changed her story and got [Williams] to lie as well. I have at least three other material witnesses that know for a fact that [Rubino] intended on allowing me a mutual separation. Upon your request I will give you those names.

*Id.*

Farrell wrote to Nelson on October 18 and invited him to submit in writing any documentation and names of witnesses supporting his application. (*See id.* Ex. B.12.) In response, Nelson transmitted by e-mail on October 24, as a statement of his side of the story, his July 20, 2001 letter to Allen. (*See id.* Ex. B.13.) He also identified as witnesses three persons, including Williams and DeFilippo, who he asserted would verify his account of the dispute. In his e-mail message describing his submission, Nelson stated that:

[t]here are other people at Nielsen who are aware that I was leaving on mutual terms, but I don't see it necessary to reveal who they are unless some weight will be given to that piece of evidence. I'm not sure why [Rubino], and subsequently [Williams] felt the need to misrepresent the story as it actually unfolded. If [DeFilippo] tells what honestly happened, my story will be verified, if she chooses to lie as well, I'm not sure what to say.

*Id.* Ex. B.13.

Farrell obtained accounts from the persons Nelson listed as witnesses, none of whom corroborated Nelson's version of the events. Williams's statement described a meeting between Rubino and Nelson (presumably the one on May 23, 2001), which Williams attended "as an impartial witness." (*Id.* at Ex. B.7.) She reported that

"[Rubino] made it clear that she was not paying him past August 31." *Id.*[3] DeFilippo's statement, recalling a conversation with Nelson during the week of July 11, Nelson's last days in the office, reported that Nelson expressed concern that Rubino was not going to live up to her agreement regarding his severance package. DeFilippo asserted that:

I asked him what he was talking about because last I left off with [Rubino], she was paying him through August. I said to [Nelson] that it was my understanding that the clock started ticking from the date he was told (May 11) and that allowing him to do some project work while he looked for a job was the deal that was struck and that they agreed he could stay on doing some project work (which was not a full-time job), and continue to look for a job simultaneously. He claimed that she misinterpreted the policy and he implied she owed him severance from the time the clock started ticking from his last day scheduled day in the office which was July 15. I couldn't believe what I was hearing. I told him that he was crazy and he was never going to win because it sounds like that is not what was agreed to.

*Id.* Ex. B.9 at NMR 074.

At a meeting on December 21, 2001, the Committee considered and rejected Nelson's claim. It concluded that Nelson had not produced sufficient documentation or other evidence supporting his claims to CTP benefits and that Nelson had received all the separation benefits to which he was entitled from Nielsen. By letter from Farrell dated December 27, 2001 Nelson was informed of the Committee's denial of his claim.

---

3. The statement then somewhat ambiguously reports a conversation with Nelson in the hallway a few weeks later, at which Nelson asked "if [Rubino] still considered it mutual. I said yes." *Id.*

Nelson then filed an action in New York Civil Court alleging breach of contract, fraud and promissory estoppel. Nielsen removed the action to this Court and filed a motion to dismiss on the ground that Nelson's state law claims were preempted by ERISA. The Court granted Nielsen's motion and gave Nelson leave to amend the complaint. *See Nelson v. Nielsen Media Research Inc.*, 207 F.Supp.2d 300 (2002). Nelson later filed an amended complaint in which he asserts three claims under ERISA: wrongful denial of Nelson's claim for benefits and breach of fiduciary duties by Nielsen and certain of its employees. The instant motion followed.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

In considering a motion for summary judgment, a court may grant the motion only if, on the basis of the record of the pleadings, depositions, answers to interrogatories and admissions, together with any affidavits filed, it concludes that there is no genuine dispute as to any material fact and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 68 (2d Cir.2000). The role of the court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

The moving party bears the initial burden of establishing the basis for the motion and identifying those portions of the materials on the record that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Koch v. Town of Brattleboro, Vermont*, 287 F.3d 162, 165 (2d Cir.2002). In this regard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In weighing whether the movant has satisfied this threshold, the court must view the record as a whole in the light most favorable to the opponent of the motion. *See id.* at 255, 106 S.Ct. 2505. In response, the opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To this end, the opponent "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Rather, he must provide specific evidence, sufficient to support a reasonable jury's rendering a verdict in his favor, to demonstrate the existence of a genuine dispute as to material fact. *See Anderson*, 477 U.S. at 248, 256, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient."); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348; *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

### B. *DENIAL OF BENEFITS*

#### 1. *Proper Party*

Nielsen first points out that Nelson's amended complaint, although making reference in one paragraph to the Plan as a defendant, names only Nielsen in the caption and that process was not formally served on the Plan. Arguing that under ERISA, a suit by a claimant seeking payment of benefits must be filed against the

plan administrator directly, and not against the sponsoring employer, Nielsen seeks dismissal for Nelson's· failure to name the proper defendant. *See* 29 U.S.C. § 1132(d)(2); *Lee v. Burkhart,* 991 F.2d 1004, 1009 (2d Cir.1993).

Nelson counters that process in this action was served on Rubino as a trustee of the Plan, which complies with the requirements of 29 U.S.C. § 1132(d)(1), and that in any event, Nielsen is a proper defendant because it effectively controls the administration of the Plan. *See Garren v. John Hancock Mut. Life Ins. Co.,* 114 F.3d 186, 187 (11th Cir.1997); *Daniel v. Eaton Corp.,* 839 F.2d 263, 266 (6th Cir.1988).

The Court finds it unnecessary to address whether Nielsen is the proper party in light of its ruling dismissing this action on other dispositive grounds.

### 2. *Wrongful Denial*

■ Nielsen argues that Nelson's challenge of the Plan's allegedly wrongful denial of his severance benefits claim must be judged by the "arbitrary and capricious" standard of review and limited to the record before the Committee at the time its decision was made. The Court agrees.

Second Circuit doctrine instructs that "where the written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, we will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 441 (2d Cir.1995) (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). A denial of benefits of a plan subject to ERISA violates this standard if the administrator's determination is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.* at 442; *see also Hogan v. Metromail,* 107 F.Supp.2d 459, 474 (S.D.N.Y.2000).

The evidence necessary to satisfy the standard does not require a preponderance but only so much proof as a reasonable decision-maker would accept as sufficient to support a rational determination. *See Maida v. Life Ins. Co. of No. Am.,* 949 F.Supp. 1087, 1091 (S.D.N.Y.1997). In assessing such evidence under the scope of review the arbitrary and capricious standard permits, the court may not consider extrinsic matters but must remain within the bounds of the administrative record considered by the plan's decision-maker. *See Miller v. United Welfare Fund,* 72 F.3d 1066, 1071 (2d Cir.1995).

These rulings convey unequivocal guidance to courts examining employee benefits eligibility determinations and plan interpretation decisions by ERISA plan fiduciaries. The message is that the scope of review under the arbitrary and capricious standard is narrow and highly deferential to a plan administrator. *See Jordan v. Retirement Committee of Rensselaer Polytechnic Inst.,* 46 F.3d 1264, 1271 (2d Cir.1995) ("The question before the reviewing court under this standard is 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment'.") (quoting *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)); *see also Wojciechowski v. Metropolitan Life Ins. Co.,* 75 F.Supp.2d 256, 262 (S.D.N.Y.1999), *aff'd,* 1 Fed. Appx. 77 (2d Cir.2001). The deference prescribed by this principle bars a court not only from looking beyond the administrative record, but from substituting its own judgment for that of the plan administrator. *See Pagan,* 52 F.3d at 442. On this point the Second Circuit has instructed that "[w]here it is necessary for a reviewing court to choose between two

competing yet reasonable interpretations of a pension plan, [the] Court must accept that offered by the administrators." *Id.* at 443 (citing *Jordan*, 46 F.3d at 1273).

Here, the Plan explicitly delegated to the Committee sufficient discretionary authority to satisfy the prerequisites for application of the arbitrary and capricious standard. Section 4.1 of the CTP designates the Committee as Plan Administrator and vests it with the "exclusive right, power and authority" to "interpret, in its sole discretion, any and all provisions of the Plan," and to "consider and decide conclusively any questions (whether of fact or otherwise) arising in connection with the administration of the Plan or any claim for severance benefits arising under the Plan." (Farrel Decl. Ex. A. § 4.1.) This provision also prescribes that any decision of the Committee made under it "shall be conclusive and binding on any affected person." (*Id.*)

■ Nelson's challenge to the instant motion apparently does not contest the applicable standard. Rather, he argues that the Committee's denial of his claim in fact was arbitrary and capricious because Farrell allegedly did not take his assertions seriously and instead credited the statements of other Nielsen employees who worked for Rubino, thus creating a conflict of interest. The Court disagrees.

The Supreme Court's ruling in *Firestone* counsels that even in cases where a benefit plan delegates discretion to an administrator and thus the arbitrary and capricious standard presumably would apply, a higher degree of scrutiny may be indicated if the administrator "is operating under a conflict of interest." 489 U.S. at 115, 109 S.Ct. 948. Further elaborating on this circumstance, the Second Circuit has instructed that where a plan administrator "is shown to have a conflict of interest" the

test to determine whether the administrator's application of the plan is arbitrary and capricious rests upon a two part inquiry: whether the administrator's decision is reasonable in light of competing interpretations, and whether the evidence shows that the administrator was in fact influenced by such conflict. *See Sullivan v. LTV Aerospace and Defense Co.*, 82 F.3d 1251, 1255–56 (2d Cir.1996).

Here, though Nelson levels conclusory charges that the Committee labored under a conflict of interest, nothing in the record substantiates the accusation. That Farrell was an employee of Nielsen supervised by Rubino is not enough. As the Second Circuit observed in *Jordan:* "[T]he simple fact that the administrator of a plan ... happens to be 'an arm of the employer' does not in itself create a conflict of interest." 46 F.3d at 1274 (citing *Kotrosits v. GATX Corp. Non–Contributory Pension Plan*, 970 F.2d 1165, 1173 (3d Cir.), *cert. denied*, 506 U.S. 1021, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992)); *see also Boesel v. Chase Manhattan Bank*, 62 F.Supp.2d 1015, 1030–31 (W.D.N.Y.1999). The Committee's decision to deny Nelson's claim was made not by Farrell alone, or by Rubino, but by the Committee, which consisted of five Nielsen management employees including Farrell and did not include Rubino. (*See* Farrell Aff. Ex. C.) Nelson offers no substantial evidence to support even an inference that the Committee as a whole was actually influenced by any alleged conflict of interest. To the contrary, the minutes of the Committee's December 21, 2001 meeting at which Nelson's claim was considered and decided indicated that Williams, because of her involvement in the case, was replaced by another person as a member of the Committee for the purpose of that meeting. (*See id.*)

In fact, the administrative record presented to the Committee contained sub-

stantial evidence which reasonable decision-makers could accept as sufficient to support the determination reached by the Committee. *See Maida,* 949 F.Supp. at 1091. The Committee considered Nelson's contentions as described in his July 20, 2001 letter, the various communications and conversations between Nelson and Nielsen officers and witness statements detailed above, as well as other relevant documents, including the terms of the CTP. (*See* Farrell Decl. Ex. C.) Significantly, the Minutes of the Committee's December 21, 2001 meeting make reference to the October 24 e-mail Nelson sent to Allen identifying three Nielsen employees who would serve as witnesses on his behalf and substantiate his claim. The Committee considered that the three individuals submitted statements refuting Nelson's account and supporting Nielsen's version of the events. (*See id.*)

The Committee specifically noted that Nelson had failed to provide any other documentation supporting his claim. (*See id.*) The considerations and reasoning supporting the Committee's determination is adequately captured in the concluding paragraphs of the Committee's minutes:

> If [Nelson] had accepted the poor performance Career Transition Plan he would have had to leave Nielsen Media research's offices in May 01(sic) and been paid through 7/12/01. If [Nelson] had left Nielsen Media Research on 7/15/01 under a poor performance Career Transition Plan he would have been paid until 8/31/01. [Nelson] actually left the office on 7/12/01 and was paid through 8/31/01. As per his resignation letter dated July 9, 2001. He did not receive a poor performance Career Transition Plan.

> Committee has to now decide appeal. Since [Nelson] is making the claim he must provided (sic) documentation to support his claim. There is no evidence from [Nelson] to allow for the Committee to over turn (sic) the original decision.

> Committee has determined [Nelson] has already received all payments due him from Nielsen Media Research.

(Farrell Decl. Ex. C.)

Reduced to basics, the construction the Committee gave to the events summarizes the essence of the dispute between the parties. Nielsen could have terminated Nelson for poor performance immediately on two occasions, on May 11, 2001 and again on July 12, 2001. Nelson then would have been entitled to reduced Plan benefits amounting to approximately six weeks of compensation. Instead, he was permitted to remain on the payroll at full salary for a total of about fifteen weeks, while working part-time, provided outplacement services, and not formally given a poor performance termination nor asked for a release. The Committee concluded that arithmetically the benefits Nelson had actually received under this arrangement exceeded the severance compensation Nelson would have collected under a poor performance separation, or even the thirteen weeks he claimed were due him under a mutual separation had his resignation been accepted as of May 11, 2001.

By Nelson's reckoning, on the other hand, he would be entitled to have collected the full pay and other benefits he actually received from May 11 through August 31, 2001, and still be owed another seven weeks of mutual separation pay, as if the poor performance issue and the CTP written agreement requirement for mutual separation did not exist. In other words, he ignores the applicability of the plan provisions that permitted Nielsen to terminate him with reduced benefits, and seeks to enforce a verbal understanding which would provide him mutual severance bene-

fits without the requisite written agreement and release the CTP called for. In support of this proposition, Nelson offered no witnesses or other documentation that backed his claim. Beyond his own statements, Nelson's sole support for his version of the facts essentially amounts to a bare charge that every one of the Nielsen employees who offered a contrary account was lying.

In this Court view, the Committee could rationally have concluded that Nelson's theory not only lacks economic plausibility but has even less grounding in reason or common sense. The Court finds no reasonable basis to support a conclusion that, on the administrative record before the Plan administrator regarding Nelson's CTP benefits claim, the Committee's decision was not based on a consideration of the relevant factors, or that it reflected a clear error in judgment, and was thus arbitrary and capricious. *See Jordan*, 46 F.3d at 1271. Accordingly, the Court concludes that Nielsen is entitled to summary judgment on Nelson's claim alleging wrongful denial of ERISA benefits.

## C. *BREACH OF FIDUCIARY DUTY*

Nelson's second and third causes of action assert breach of fiduciary duties and invoke 29 U.S.C. §§ 1104, 1105, 1109 and 1132(a). Specifically, he alleges that Rubino and Farrell "changed and/or falsified information related to Plaintiff's separation, for the purpose of denying Plan benefits sought by Plaintiff." (Compl. ¶ 25) He further claims that Farrell in particular, because she reported directly to Rubino, was in a position to know and correct the alleged breach of fiduciary duty but failed to do so. (*See id.* at ¶ 35.)

Nelson's response papers to the instant motion do not specifically address Nielsen's legal objections to these claims. It is therefore unclear whether, by failing to oppose, Nelson has effectively conceded or withdrawn these claims. In any event, Nelson's breach of fiduciary claims fail for three reasons. First, they rest on essentially the same events and factual record that the Court has found sufficient to defeat Nelson's claim of wrongful denial of benefits. The Court finds nothing in the evidence before it to support a rational conclusion that the Committee as a whole, or any Nielsen officials individually, breached any fiduciary duty owed to Nelson personally as a beneficiary of the Plan.

Second, as Nielsen correctly argues, Nelson's causes of action asserting breach of fiduciary duty demand the same monetary remedy asserted under his claims for wrongful denial of benefits. Such recovery is barred under both 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3). Subsection (a)(2) provides a remedy for breach of fiduciary duty only on behalf of the plan, not on behalf of individual beneficiaries. In *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 144, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), the Supreme Court, holding that ERISA does not authorize an action by a plan beneficiary for an award of extracontractual damages, noted that: "[t]he entire text of [ERISA] § 409 persuades us that Congress did not intend that section to authorize any relief except for the plan itself."; *see also Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir.1993); *Kishter v. Principal Life Ins. Co.*, 186 F.Supp.2d 438, 442 (S.D.N.Y.2002).

Finally, subsection (a)(3) permits actions only to obtain an injunction or "other appropriate equitable relief." 29 U.S.C. § 1132(a)(3). In *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), the Supreme Court held that a suit seeking an injunction to compel reimbursement of payments of money past due under on ERISA plan was not available under sub-

section 502(a)(3) because such an action did not qualify as relief typically available in equity. *See id.,* 122 S.Ct. at 717–718 (citing *Mertens v. Hewitt Associates,* 508 U.S. 248, 256, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)); *Lee,* 991 F.2d at 1011 ("The plain language of the statute does not provide for monetary relief and a review of the legislative history confirms that Congress did not contemplate that this phrase would include an award of money damages."); *Kishter,* 186 F.Supp.2d at 442. Accordingly, Nelson's Second and Third Causes of Action must be dismissed.

## D. *ATTORNEY'S FEES*

■ Nelson's Fourth Cause of Action seeks attorney's fees pursuant to the discretionary authority conferred on the Court by 29 U.S.C. § 1132(g)(1). The Court finds no reasonable basis to support an award of attorney's fees to either party under the circumstances of this case.

■ As a final matter, accompanying his response to the instant motion, Nelson submitted a letter addressed to the Court alleging that Nielsen had failed to comply with the requirement of Local Rule 56.2 concerning Notice to *Pro Se* Litigants Opposing Summary Judgment. Nielsen counters this assertion with a copy of a cover letter dated September 27, 2002 addressed to Nelson enclosing Defendant's Motion for Summary Judgment and accompanying Memorandum of Law in Support of Defendant's Motion for Summary Judgment in this matter. (*See* Reply Memorandum in Further Support of Defendant's Motion to Summary Judgment, dated November 1, 2002, letter attached following page 6.) This letter contains notice of the instant motion sufficient to comply with Rule 56.2. Nelson's submission of his own Rule 56.1 statement suggests that he was sufficiently informed of the procedure and its implications.

## III. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the Court's Order dated November 27, 2002 is amended to incorporate the discussion set forth above; and it is further

**ORDERED** that defendant Nielsen Media Research Inc.'s motion for summary judgment is granted with respect to all causes of action asserted in the amended complaint of plaintiff Sean Alan Nelson.

The Clerk of Court is directed to close this case.

**SO ORDERED.**