# PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ANDREW J. REGO,
          *Plaintiff-Appellant,*

v.

WESTVACO CORPORATION; WESTVACO
CORPORATION SAVINGS AND
INVESTMENT PLAN FOR SALARIED
EMPLOYEES; WESTVACO RETIREMENT
PLAN FOR SALARIED EMPLOYEES; ERIC
J. LANCELLOTTI,
          *Defendants-Appellees.*

No. 02-1336

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
James A. Beaty, Jr., District Judge.
(CA-99-702)

Argued: December 3, 2002

Decided: February 10, 2003

Before WILKINSON, Chief Judge, KING, Circuit Judge, and
Joseph R. GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

---

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge King and Judge Goodwin joined.

---

## COUNSEL

**ARGUED:** John David James, SMITH, JAMES, ROWLETT &
COHEN, L.L.P., Greensboro, North Carolina, for Appellant. Wood

Walter Lay, HUNTON & WILLIAMS, Charlotte, North Carolina, for Appellees. **ON BRIEF:** Patricia K. Epps, Michael L. Walton, HUNTON & WILLIAMS, Richmond, Virginia, for Appellees.

---

**OPINION**

WILKINSON, Chief Judge:

Andrew Rego filed suit against his employer, two employee benefits plans, and the administrator of those plans, alleging a series of violations of the Employee Retirement Security Act (ERISA). The gravamen of his complaint was a charge that defendants had prevented him from withdrawing his share of one of the benefits plans in time to take advantage of a high stock price. He also claimed that defendants had failed to give him statutorily required information and that they had improperly delayed his pension payments by a month. The district court dismissed most of his allegations for failure to state a claim and remanded several claims for administrative resolution. The plan administrator granted Rego relief on one of his claims and rejected the rest, and the district court affirmed the plan administrator. We affirm the district court.

I.

Rego was employed by Westvaco Corporation from 1980 to 1997, working as Southeast Region Sales Representative for most of that time. During his employment, he participated in two employee benefit plans administered by Westvaco: the Westvaco Corporation Savings and Investment Plan for Salaried Employees ("Savings Plan") and the Westvaco Retirement Plan for Salaried Employees ("Pension Plan"). The parties have stipulated that both the Savings Plan and the Pension Plan are "employee benefit pension plan[s]" within the meaning of the Employee Retirement Income Security Act. 29 U.S.C. § 1002(2)(A) (2002). The Savings Plan is funded partly by contributions from participants and partly by contributions from Westvaco. The Pension Plan is funded entirely by Westvaco. Rego regularly received communications pertaining to each plan, including a Summary Plan Description. He also attended a Pre-Retirement Seminar in 1996 for Savings Plan participants.

In May 1997, Westvaco notified Rego that his position with Westvaco was going to be eliminated and that he would be terminated effective October 15, 1997. He was told to contact human resources employee Cheryl Blume with any questions he had regarding the company Savings Plan and Pension Plan.

On October 16, 1997, Westvaco sent Rego a letter with information about his company benefits and the mechanics of withdrawing funds from the two Plans after his termination. The letter informed Rego that he was eligible to submit distribution forms at any time, and that if he chose to withdraw funds from the Plan, his "account would be valued on the Tuesday next following or coincident with the receipt of [his] distribution form." The Plan itself states that a terminated employee will be able to withdraw all of his funds on "any Valuation Date [any Tuesday when the New York Stock Exchange is open] elected by the member." Likewise, the Summary Plan Description states that a terminated employee can receive a distribution of all his funds with an immediate valuation if he turns in his request by 4:15 p.m. on the Valuation Date of his choice.

Rego alleges that he and his wife repeatedly asked Blume to specify the earliest date that Rego's funds in the Savings Plan could be valued and distributed. According to Rego, Blume consistently responded that the earliest point Rego could do this was November 4, 1997. Blume testified that she does not recall any such conversation, but offered one reason why she might have identified November 4 as the relevant date. Rego was actually entitled to a valuation and distribution of some of his assets on October 21, 1997 — the first Valuation Date following his termination. But because he did not receive his final paycheck (a portion of which was automatically invested in the Savings Plan on his behalf) until the end of October, Rego could not actually have withdrawn *all* of his funds from the Plan until November 4. Blume testified that, therefore, "if he had asked me, when can I withdraw all of my funds, then I would have had to tell him . . . November 4th."

Another employee who had been terminated on the same day as Rego went directly to Blume on October 21, 1997 and told her that he wanted his interest in the Savings Plan valued and distributed

effective that day. Blume executed the employee's request, and he received his distribution with a valuation date of October 21.

Based on the information given to him by Blume, Rego requested that his holdings in the Savings Plan be valued and distributed to him at the earliest time he thought possible: November 4. Had his holdings been valued on October 21, they would have been worth $197,228. However, on October 27, the value of the stock in the Plan fell substantially, and Rego notified Blume that he no longer wanted his portion of the Savings Plan distributed on November 4.

More than a year later, on January 25, 1999, Rego submitted distribution forms directing defendants to distribute his Savings Plan funds by sending the cash proceeds to one IRA and the stock shares to another IRA. Rather than filling out the pre-printed distribution forms completely, he attached a separate sheet detailing his instructions for the distribution. Blume approved the forms and told Rego that the valuation would be effective on February 9. The valuation on February 9 would have been $126,146. However, Blume was then told by another Westvaco employee that Rego could not make multiple distributions from his funds. She was told that this "was not company policy but a matter of cost and Westvaco chose not to do multiple rollovers."

On February 16 and 17, another employee of Westvaco told Rego and his wife that he could not make his distribution as requested, both because multiple rollovers were impossible and because forms could not be completed by reference to attached materials. Rego and his wife replied that he should not have to file new forms, and that his distribution should be valued based on the February 9, 1999 valuation. However, on February 25 Rego received a letter stating that he was required to file new forms, and that the valuation would be based on the value on the Tuesday following the date of the receipt of the forms. This letter did not inform him that he had a right to appeal the determination about the Savings Plan distribution.

Ultimately, Rego's interest in the Savings Plan was distributed to him in the form of stock on March 2, 1999 and valued at $113,796. He eventually sold the stock through several transactions at the end of 1999 for a total of $182,288.

Besides the dispute over the Savings Plan distributions, the two parties have also joined issue over Westvaco's handling of Rego's Pension Plan participation. On May 6, 1998, Rego prepared, notarized, and mailed forms to begin his pension payments on February 1, 1999. However, when his wife called Westvaco in January 1999 to ensure that pension payments would begin as scheduled, she was told that Westvaco could not find any retirement forms for Rego. She then faxed copies of the forms to Westvaco, which were received on January 27. Westvaco took no action until February 5, 1999, at which point Rego's wife was informed that the forms were incorrect because they were more than ninety days old. Rego had not been aware of the ninety-day rule, because the statement of that rule was contained in an April 1997 Pension Plan amendment that he never received. Rego's pension was not started until March.

Rego filed suit against Westvaco, its Plan Administrator, the Savings Plan, and the Pension Plan. His claims focused on four issues: Westvaco's failure to value his assets on October 21, 1997, Westvaco's failure to value his assets on February 9, 1999, Westvaco's failure to begin his Pension Plan payments in February 1999, and Westvaco's failure to provide him with statutorily required information. The district court dismissed most of his claims under Fed. R. Civ. P. 12(b)(6). It remanded three of them — a claim for the difference in his Savings Plan assets between the October 21, 1997 and March 2, 1999 valuation, a claim for the difference in those assets between the February 9, 1999 and March 2, 1999 valuation, and a claim for the money he would have received from the Pension Plan between February 1 and March 1, 1999 — for exhaustion of administrative remedies before the Benefits Plans Administration Committee (BPAC), the entity responsible for the resolution of administrative claims related to the Savings Plan and the Pension Plan.

Administrative remedies resulted in an award to Rego of the pension money that should have been paid to him during February 1999, with interest. His claims under the Savings Plan, however, were rejected. The district court dismissed his challenge to the administrative ruling on summary judgment. The court also refused to grant him attorney's fees for the expense of pursuing his Pension Plan claim administratively. Rego now appeals.

## II.

Rego first claims that he was entitled to relief under 29 U.S.C. § 1132(a)(3), which allows plaintiffs to obtain "appropriate equitable relief" for ERISA violations in certain cases. 29 U.S.C. § 1132(a)(3) (2002). Specifically, he argues that defendants breached their fiduciary duty by failing to give him complete and accurate information about his benefits plans when he requested it. He contends that communications on plan benefits are a fiduciary function and that § 1132(a)(3) therefore provides him with a cause of action to remedy defendants' breach. He requests an order of specific performance requiring defendants to issue him roughly $85,000 in Westvaco stock, or the difference between the valuation on October 21, 1997 and March 2, 1999.

The district court dismissed this claim on summary judgment, holding that Rego's requested relief was not fairly classifiable as equitable, which is required for a claim to proceed under § 1132(a)(3). We agree.

Rego begins by arguing that, at common law, actions for breach of fiduciary duty by a trustee could only be brought in equity. *See* Austin Wakeman Scott & William Franklin Fratcher, *The Law of Trusts* § 197 (4th ed. 1988). He therefore contends that under § 1132(a)(3) any "remedy, when sought for breach of fiduciary duty, is always an equitable remedy." The Supreme Court has squarely rejected this argument, holding that it would read the statute to render the modifier "equitable" superfluous, since "*all* relief available for breach of trust could be obtained from a court of equity." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 257 (1993) (emphasis in original). Defining equitable relief, in other words, as "'whatever relief a common-law court of equity could provide in such a case' would limit the relief *not at all*." *Mertens*, 508 U.S. at 256 (emphasis in original). Rather, § 1132(a)(3) authorizes only "those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." *Id.* at 257 (emphasis in original). And the scope of this relief is emphatically not defined by reference to the "many situations" at common law "in which an equity court could establish purely legal rights and grant legal remedies which would otherwise be beyond the scope of its authority." *Id.* at 256 (internal quotation

omitted). Under *Mertens*, then, the relevant question is not whether a given type of case would have been brought in a court of equity, but whether a given type of relief was available in equity courts as a general rule. And the relief Rego seeks was not available. In fact, "monetary relief for all losses . . . sustained as a result of [an] alleged breach of fiduciary duties. . . . [was] the classic form of *legal* relief." *Id.* at 255 (emphasis in original).

Rego then argues that his claim can be considered a request for equitable restitution or a constructive trust — a type of relief which was typically available in courts of equity. This claim fails as well. In *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), the Supreme Court addressed this issue in the course of denying a claim for relief under § 1132(a)(3). With a minor exception not relevant here, a claim for equitable restitution must seek "not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 214. The plaintiff, in other words, must argue that "money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.* at 213. It is only under such circumstances that plaintiffs can proceed in equity with a claim for restitution; other claims for restitution are considered "restitution *at law*." *Id.* (emphasis in original).

In this case, defendants possess no particular fund or property that can be clearly identified as belonging in good conscience to the plaintiff. The "particular fund[ ] or property" that is the basis of Rego's claim was simply his share of the Savings Plan. And that share has long since been transferred to Rego; it is no longer in defendants' possession.

Rego next argues that the relief he seeks is equitable because make-whole relief has traditionally been available under trust law as an equitable form of relief for a trustee's breach of duty. But it is obvious on the face of his complaint that Rego is not actually trying to make himself whole. At most, defendants' actions caused Rego to lose approximately $24,500: the difference between the valuation on October 21, 1997 and the amount for which he eventually sold his shares. Rego, however, requests far more than that amount: approxi-

mately $80,000, a figure based on the difference between the October 21 valuation and the March 2, 1999 valuation. This claim in no way corresponds to any out of pocket loss; it is thus in no sense a request to be "restored to the position [he] would have occupied if the misrepresentations . . . had never occurred." *Howe v. Varity Corp.*, 36 F.3d 746, 756 (8th Cir. 1994), *aff'd*, 516 U.S. 489 (1996). We decline to consider it "appropriate equitable relief" authorized by § 1132(a)(3).

### III.

Rego also brings a claim for relief under 29 U.S.C. § 1132(a)(1)(B), which entitles plaintiffs "to recover benefits due to [them] under the terms of [their] plan." 29 U.S.C. § 1132(a)(1)(B) (2002). He claims that the BPAC improperly denied him benefits by refusing his claim for the difference between the October 21, 1997 valuation and the March 2, 1999 valuation. He argues that, had it not been for the misinformation promulgated by Westvaco and its employees, he would have withdrawn the lion's share of his Savings Plan assets on October 21, 1997 rather than on March 2, 1999, when their value was substantially lower. He argues that under § 1132(a)(1)(B) he is therefore entitled to recover the difference between the valuations on those two dates. The district court rejected this claim, and we affirm.

A denial of benefits challenged under § 1132(a)(1)(B) is "reviewed under a de novo standard unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When reviewing an administrative decision regarding benefits, then, a court must determine whether the plan's language confers such discretion on the administrator, and if so, whether the administrator's decision falls within the scope of the discretion conferred. *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 89 (4th Cir. 1996). If the administrator acted within the scope of discretion conferred on him by the plan, the decision is reviewed merely for abuse of discretion. *Id.* If the administrator did not act within the scope of such discretion, the decision is reviewed de novo. *Bruch*, 489 U.S. at 115.

In resolving this initial question, "[w]e have not . . . always required an explicit grant of discretionary authority. Rather, we have

recognized that a plan's terms can create discretion by implication." *Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 523 (4th Cir. 2000). Such discretion can be inferred from the plain language of both the plan itself and the Summary Plan Description. *See Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 124 (4th Cir. 1994); *see also Buce v. Allianz Life Ins. Co.*, 247 F.3d 1133, 1138, 1141 (11th Cir. 2001). In *United McGill Corp. v. Stinnett*, 154 F.3d 168 (4th Cir. 1998), for example, discretionary authority was found where a plan granted the administrator authority to "construe the terms of the Plan and resolve any disputes which may arise with regard to the rights of any persons under the terms of the plan." *Id.* at 171. And in *Boyd v. Trustees of the United Mine Workers Health & Retirement Funds*, 873 F.2d 57 (4th Cir. 1989), we found implied discretionary authority where the administrator was given the power of "full and final determination as to all issues concerning eligibility for benefits" and was "authorized to promulgate rules and regulations to implement this Plan." *Id.* at 59.

The language in the Savings Plan grants this kind of implied discretionary authority. Like the language in *Boyd*, the Savings Plan instructs the administrator to "adopt such procedures and rules as he deems necessary or advisable to administer the Plan." And like the plans in *Boyd* and *Stinnett*, the Summary Plan Description provides that the BPAC is responsible for both the "determination of participants' eligibility to receive benefits" and the "determination of appeals of denied claims." As the district court noted, these grants of authority indicate that "the administrator is the ultimate and final decision-maker with respect to coverage under the Savings Plan." This in turn demonstrates that the Savings Plan gives the administrator discretionary authority to make benefits eligibility determinations.

It is clear BPAC was acting within the scope of this discretion when it made the decision currently under review. As discussed above, BPAC is charged with making final determinations on appeals of denied benefits claims. That is precisely what it did here. Since BPAC was acting within the scope of the discretion conferred on it by the Savings Plan, we review its decision only for abuse of discretion.*

---

*Rego contends that we should actually apply a de novo standard regardless of the language in the Savings Plan and the Summary Plan

There was ample evidence to support the BPAC's refusal to grant Rego the difference between the valuations on October 21, 1997 and March 2, 1999. The Summary Plan Description, the Savings Plan itself, and the letter sent to Rego on October 16, 1997 all informed Rego that he would be able to make his first withdrawal from the plan on the Tuesday following his termination — October 21, 1997. The October 16 letter was particularly explicit in this regard. Furthermore, Blume failed to confirm Rego's contention that she had told him that his earliest possible distribution date was November 4. Indeed, she had processed distribution forms on October 21 for another employee who had been terminated on the same day as Rego. In the words of the report adopted by the BPAC, "[i]t does not make sense that she would process [the other employee's distribution request forms on October 21, 1997], but tell Mr. Rego that he could not take his distribution until November 4, 1997." In combination, these factors were more than sufficient to support the BPAC's conclusion that Westvaco was not responsible for Rego's failure to apply for a distribution effective October 21, 1997.

IV.

Rego argues in the alternative that the BPAC improperly denied him benefits by refusing his claim for the difference between the February 9, 1999 valuation and the March 2, 1999 valuation. Asserting that Westvaco's reasons for denying him a distribution on February 9 were legally insufficient, he contends that he is therefore entitled to "recover benefits due to him under the terms of his plan" in the form of the difference between the valuations on those two dates. 29 U.S.C. § 1132(a)(1)(B). The district court rejected this claim, and we affirm.

---

Document, for two independent reasons. First, he argues that he did not receive a full and fair review when the claim was initially denied. The locus of our scrutiny, however, is the BPAC's ultimate decision and not any earlier proceedings in the case. And the fact that the parties offer contradictory evidence about whether Blume gave Rego accurate information about his earliest distribution date does not render the BPAC's review less than full and fair. Second, Rego argues in passing that the BPAC's decision was compromised by a conflict of interest. He does not explain his contention, however, and certainly offers no basis for us to overturn the district court's rejection of this claim.

For the reasons discussed in Part III, we hold that the BPAC was acting within the discretion conferred upon it by the Plan when it denied Rego's claim on this score. We therefore review its decision under the deferential abuse of discretion standard prescribed by *Haley*, 77 F.3d at 89, and hold that the BPAC did not abuse its discretion in rejecting Rego's request for benefits.

There was sufficient evidence before the BPAC to justify its denial of Rego's claim. When submitting his request for a distribution on February 9, Rego made two errors. First, Rego submitted his instructions for the distribution in a letter to the administrators rather than on the distribution form itself. But the Savings Plan Trustee, Wachovia Bank — which is not a party to this lawsuit — refuses to distribute a beneficiary's funds if the distribution instructions are written on the attachments rather than on the distribution form itself. Second, Rego requested that his Savings Plan funds be distributed to two different financial institutions. But longstanding Savings Plan policy requires participants to distribute their Plan funds to only one financial institution, since the alternative "would be too complex and costly to administer." Despite these mistakes, the Savings Plan promptly distributed Rego's shares to him as soon as he corrected the flaws in his request. Together, these facts presented a sufficient basis for the BPAC to deny Rego's claim for improperly-denied benefits.

Any complex administrative process requires uniformity and adherence to basic filing rules. As the Seventh Circuit has noted, "[a] plan administrator's duty to act in the best interest of all the beneficiaries cannot mean that it must cater to the optimal needs of each individual beneficiary." *Ameritech Benefit Plan Comm. v. Communication Workers of Am.*, 220 F.3d 814, 825 (7th Cir. 2000). It was reasonable for the BPAC to find that Rego was not entitled to a distribution of his funds until he had complied with the basic filing regulations of the plan.

V.

Rego also attempts to fashion two claims under federal common law: one for negligent misrepresentation and the other for breach of fiduciary duty. He asserts that these causes of action must be created in order to fill the gaps of the ERISA statutory scheme. The district

court dismissed this claim under Fed R. Civ. P. 12(b)(6), and we affirm.

The Supreme Court has been unequivocal in its warning that courts should be "especially reluctant to tamper with [the] enforcement scheme embodied in the [ERISA] statute by extending remedies not specifically authorized by its text." *Knudson*, 534 U.S. at 209 (internal quotation omitted). The instant case presents no gap in ERISA that requires an interstitial fix. Essentially, Rego is attempting to recover damages for a denial of benefits and a breach of fiduciary duty, two actions for which ERISA already creates remedies. *See* 29 U.S.C. § 1132(a)(1)(B) (denial of benefits); 29 U.S.C. § 1132(a)(3) (breach of fiduciary duty); *see generally Varity Corp. v. Howe.*, 516 U.S. 489, 510 (1996) (breach of fiduciary duty). Congress clearly contemplated plaintiffs like Rego and explicitly created remedies for them within the text of the statute itself. We may not disregard Congress' decision to limit the scope of those remedies.

Rego contends that the Fourth Circuit has already implemented a common law version of the remedy he seeks. In *Provident Life & Accident Insurance Co. v. Waller*, 906 F.2d 985 (4th Cir. 1990), the court allowed an insurance company to proceed against a beneficiary under a theory of unjust enrichment. "The use of a federal common law theory claim of unjust enrichment in *Waller*," however, "was clearly the exception and not the rule for ERISA cases." *Elmore v. Cone Mills Corp.*, 187 F.3d 442, 449 (4th Cir. 1999). In *Waller*, the insurance company had issued a payment to the beneficiary to cover medical costs for an injury sustained in a car accident. The beneficiary subsequently collected damages from the other driver, but refused to reimburse the insurance company as the plan explicitly contemplated. *Waller*, 906 F.2d at 986-87. We allowed the insurance company to proceed under federal common law because "ERISA [did] not provide an explicit remedy" for the insurance company. *Id.* at 990. The present case is quite different. As noted above, Rego already has causes of action available to him within the explicit text of ERISA. His lack of success on the merits of those claims does not mean that ERISA suffers from a gap that requires plugging.

VI.

Rego also seeks liquidated damages for defendants' failure to provide him with certain information relating to his rights as a benefi-

ciary. Rego contends that defendants did not inform him that he could appeal their refusal to start his Pension Plan benefits on February 9, 1999. He further contends that defendants did not provide him notice of amendments made to the Pension Plan that were a partial basis for their refusal to begin his Pension Plan benefits on February 9, 1999. Rego argues that he is therefore entitled to liquidated damages of $100 per day under 29 U.S.C. § 1132(c)(1)(B). The district court dismissed this claim under Fed. R. Civ. P. 12(b)(6), and we affirm.

To state a claim under § 1132(c)(1)(B), a plaintiff must allege that he submitted "a request for . . . information" which was ignored by defendants. 29 U.S.C. § 1132(c)(1)(B); *see also Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1167 (3d Cir. 1990). Rego argues that he did not need to submit such a request because defendants were required to give him the information whether or not he requested it. *See* 29 U.S.C. § 1133 (obligation to provide beneficiaries a reasonable opportunity to appeal a denial of benefits); 29 U.S.C. § 1024(b)(1) (obligation to inform beneficiaries about amendments to an ERISA-covered plan). But even assuming arguendo that defendants violated § 1133 and § 1024(b)(1), it would contravene the clear text of § 1132(c)(1)(B) to choose liquidated damages as a remedy for those violations absent an active "request for . . . information" by a beneficiary. Rego's amended complaint nowhere alleges that he requested any information from defendants which they refused to deliver to him. His failure to do so means that he also fails to state a claim.

## VII.

Finally, Rego appeals the district court's denial of attorney's fees. He argues that since administrative review of his Pension Plan claim awarded him the substantive relief he had requested, he should receive attorney's fees and costs related to that claim. The district court dismissed this claim, and we affirm.

A large portion of the fees in question stem from expenses incurred during administrative proceedings. 29 U.S.C. § 1132(g) authorizes district courts to allow "a reasonable attorney's fee" in "any action under [ERISA]." 29 U.S.C. § 1132(g)(1) (2002). While the word "action" need not necessarily mean litigation in district court, *see Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546,

559-61 (1986), here we agree with our sister circuits that have held ERISA attorney's fees to be categorically unavailable for expenses incurred while exhausting administrative remedies. *See Cann v. Carpenters' Pension Trust Fund for N. Cal.*, 989 F.2d 313, 316 (9th Cir. 1993) ("We construe [§ 1132(g)(1)] as limiting the award to fees incurred in the litigation in court."); *Anderson v. Procter & Gamble Co.*, 220 F.3d 449, 455 (6th Cir. 2000) ("[Section] 1132(g)(1) should not be interpreted to permit fee awards for legal expenses incurred in the course of exhausting administrative remedies.").

ERISA is characterized in part by a congressional "desire not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place." *Varity Corp.*, 516 U.S. at 497. For this reason, Congress required benefits plans to create internal dispute resolution procedures in order "to minimize the number of frivolous ERISA lawsuits; promote the consistent treatment of benefit claims; provide a nonadversarial dispute resolution process; and decrease the cost and time of claims settlement." *Makar v. Health Care Corp. of Mid-Atlantic (Carefirst)*, 872 F.2d 80, 83 (4th Cir. 1989). If attorneys were injected into those administrative procedures as a matter of course, it would establish a far higher degree of formality and lead to more protracted litigation in a great many cases. The resulting combination of increased litigation costs and decisions by benefits plans to pay questionable claims so as to avoid such costs could severely undermine the congressional purpose of promoting "the soundness and stability of plans with respect to adequate funds to pay promised benefits." 29 U.S.C. § 1001(a) (2002); *see Cann*, 989 F.2d at 317. It is largely for this reason that ERISA claimants must exhaust the remedies provided by their benefit plans before bringing an ERISA action for denial of benefits. *Makar*, 872 F.2d at 81. The majority of claims should thus be resolved through informal administrative processes, for which no award of attorney's fees is authorized.

Rego also seeks attorney's fees for the time spent litigating the Pension Plan dispute in district court. In this case, the only reason that the administrative proceedings were mandated after court proceedings had already begun was because Rego had failed to exhaust them in the first place as required by *Makar*. If Rego had exhausted those remedies before commencing litigation, he would have no litigation-

related expenses to which a fee award under § 1132(g)(1) could apply, since he would have been successful at the administrative level on his Pension Plan claim. We therefore hold that the district court did not abuse its discretion in refusing to award any attorney's fees to Rego.

## VIII.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.