[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-12615
Non-Argument Calendar

_____

D.C. Docket No. 9:18-cv-80110-RLR


WEBSTER HUGHES,

Plaintiff-Appellee,

versus

PRIDEROCK CAPITAL PARTNERS, LLC.,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 28, 2020)

Before WILLIAM PRYOR, JILL PRYOR, and LUCK, Circuit Judges.

PER CURIAM:

Webster Hughes sued Priderock Capital Partners, LLC, to recover damages for Priderock's failure to compensate him for services he provided. After the district court granted summary judgment in Priderock's favor on two of Hughes's claims, Priderock conceded liability on Hughes's remaining claim for breach of contract implied in law. As a result, the only question to be resolved was the amount of damages owed to Hughes, which the parties agreed should be awarded on a theory of unjust enrichment. Over Priderock's objection, the district court submitted the question of damages to a jury. On appeal, Priderock argues that Hughes had no right to a jury trial and that the jury's verdict was contrary to both the district court's instructions and the clear weight of the evidence. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Hughes is a mathematician experienced with mortgage-backed securities.[1] In the summer of 2015, Hughes was approached by David Worley to help start an investment fund. Worley told Hughes that he was working with a real-estate investment firm—Priderock—that wanted to invest in a special type of mortgage-backed securities called K-Deals. Hughes understood that his role would be to serve

---

[1] "A mortgage-backed security is a security that entitles the holder to share in the payments (cash flow) from a fixed pool of mortgage loans." Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.2d 1127, 1133 n.1 (10th Cir. 1991).

as an expert (by educating his partners and investors about K-Deals) and as an analyst (by building financial models to predict how much money the fund would make).  Hughes agreed to join the project and immediately got to work.

Although Hughes worked on the project through May 2017, Priderock did not pay Hughes a salary for his efforts.  In June 2017, Priderock formally ended its business relationship with Hughes and offered him $100,000 as a separation payment.  Hughes rejected the offer.

In January 2018, Hughes sued Priderock in the Southern District of Florida. Hughes asserted three claims under Florida law: breach of oral contract, breach of contract implied in fact, and breach of contract implied in law.  The district court granted summary judgment in Priderock's favor on the first two claims, concluding that they were barred by Florida's statute of frauds.  Priderock conceded liability as to the third claim, breach of contract implied in law, so the only question remaining was the amount of damages that Hughes was entitled to.  The parties agreed that damages should be "awarded on a theory of unjust enrichment"; that is, they agreed Hughes was entitled to the "value of the benefit Priderock received from [his] services."

Priderock then moved to strike Hughes's demand for a jury trial and have the district court determine damages.  Priderock argued that unjust enrichment was equitable in nature and therefore Hughes had no right to a jury trial.

3

The district court denied Priderock's motion. It concluded that Hughes's right to a jury trial depended on whether he had a suit "at common law" within the meaning of the Seventh Amendment. To answer that question, the district court applied the Supreme Court's two-part test enunciated in Granfinanciera, S.A. v. Nordberg, 492 U.S. 33 (1989). Under that test, a court must first "compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity." Granfinanciera, 492 U.S. at 42 (citation omitted). It must then "examine the remedy sought and determine whether it is legal or equitable in nature." Id. (citation omitted).

On part one of the test, the district court concluded that Hughes's claim for breach of contract implied in law was "a legal claim." The district court determined that, under Florida law, a claim for breach of contract implied in law is "evaluated on the theory of unjust enrichment." The district court cited several Florida cases holding that unjust enrichment is a legal action and concluded that the cases Priderock cited for the proposition that unjust enrichment is an equitable action were unpersuasive.

On part two, the district court concluded that Hughes was "seeking a legal remedy, rather than an equitable one." The district court noted that Hughes was not "seeking an order . . . to release funds from an escrow account or a specified sum from an employee benefit account[;] [i]nstead, [Hughes sought] damages in the

4

amount of 'the value of the benefit that [he] . . . conferred on Priderock.'" The district court stated that "[Hughes's] unjust enrichment claim [was] a legal claim, as it [sought] monetary damages, a hallmark of a legal action." Thus, having determined that both parts of the Supreme Court's test favored Hughes, the district court concluded that Hughes had a right to a jury trial under the Seventh Amendment. The district court further noted that, "[t]o the extent that [it was] a debatable question, '[t]he federal policy favoring jury trials [was] of historic and continuing strength.'"

At trial, the parties offered differing opinions as to Hughes's role in the project and the value of his services. Hughes argued that he was "essential" to the project. He argued that he worked 3,360 hours, a reasonable hourly rate was $400, and thus he was entitled to $1,344,000. Alternatively, Hughes estimated that the overall "success" of the fund would be between $20 million and $30 million, and he contended that he was entitled to five percent of that amount. On the other hand, Priderock argued that Hughes had an "exaggerated view of his role." Priderock asserted that Hughes had worked far less hours than he claimed and therefore was entitled to only $100,000. Moreover, Priderock argued that Hughes's estimate that the fund would receive between $20 million and $30 million in returns was "sheer fantasy." According to Priderock, the fund lost money in 2017 and 2018 and was projected to lose money in 2019.

Early into its deliberations, the jury sent out a note asking, "Can Dr. Hughes be awarded a percent of profit over time? Does the awarded amount have to be an exact figure?"  The parties agreed that the answer to the first question should be "no."  As for the second question, Hughes argued that the award did not need to be an exact figure, and Priderock disagreed.  The district court ultimately answered "no" to the first question and "yes" to the second.

The jury returned a verdict awarding $1,250,000 to Hughes.  Priderock then moved for a new trial.  According to Priderock, the jury's verdict could "rest on only two possible theories": (1) compensation for Hughes's lost wages; or (2) an award of five percent of the fund's estimated overall success.  Priderock argued that the first theory contradicted the district court's ruling that "the accepted measure of damages in an unjust enrichment claim is gain to the defendant, not the loss to the [p]laintiff."  Similarly, Priderock argued that the second theory violated the district court's instruction (given in response to the jury's question) that Hughes may not be awarded a percentage of profits.

Priderock also argued that the jury's verdict was contrary to the clear weight of the evidence.  Priderock stated that "[f]or Hughes to have earned $1,250,000 at $400 per hour, he would have had to work 3,125 hours" and "[n]othing in the record suggest[ed] Hughes worked 3,125 hours." Priderock reasoned that if the jury instead based its verdict on a share of overall success, then the jury must have found that

Hughes was entitled to five percent of $25 million. Priderock argued that no evidence supported the jury's assumption that the fund would receive overall returns of $25 million or that Hughes was entitled to five percent of that amount.

While its motion for new trial was still pending, Priderock filed a motion to alter or amend judgment under Federal Rule of Civil Procedure 59(e). Priderock argued that this court's then-recent decision in Hard Candy, LLC v. Anastasia Beverly Hills, Inc., 921 F.3d 1343 (11th Cir. 2019), constituted "an intervening change in the controlling law governing the Seventh Amendment right to trial by jury." According to Priderock, Hard Candy showed that Hughes had no right to a jury trial on his unjust enrichment claim. As such, Priderock asked the district court to vacate its judgment and order a bench trial.

The district court denied both of Priderock's motions. Priderock timely appealed.

## STANDARDS OF REVIEW

We review a district court's denial of a motion to strike a jury demand de novo. See FN Herstal SA v. Clyde Armory Inc., 838 F.3d 1071, 1080 (11th Cir. 2016) (reviewing de novo the grant of a motion to strike a jury demand). "We review the denial of a motion to alter or amend a judgment under Rule 59(e) for abuse of discretion." Shuford v. Fidelity Nat'l Prop. & Cas. Ins. Co., 508 F.3d 1337, 1341 (11th Cir. 2007). Likewise, "[w]e review a district court's denial of a motion for

new trial only for an abuse of discretion." Myers v. TooJay's Mgmt. Corp., 640 F.3d 1278, 1287 (11th Cir. 2011). "[N]ew trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." Id. (citation omitted).

## DISCUSSION

Priderock raises two issues on appeal. First, Priderock argues that the district court erred in denying Priderock's motion to strike Hughes's jury demand and abused its discretion in denying Priderock's rule 59(e) motion. Both orders dealt with the same issue—whether Hughes had a right to a jury trial. Second, Priderock argues that the district court abused its discretion in denying Priderock's motion for new trial because the jury's verdict was contrary to both the district court's instructions and the clear weight of the evidence.

### *Whether Hughes had a Right to a Jury Trial*

The district court concluded that Hughes had a right to a jury trial because it determined that his claim for breach of contract implied in law was "a legal claim" and his requested relief, unjust enrichment, was "a legal remedy, rather than an equitable one." Priderock argues that Hughes had no right to a jury trial because his claim "closely resembles 18th-century actions in equity" and because he was seeking an equitable remedy—namely, disgorgement.

8

We begin our analysis with the Seventh Amendment, which preserved "the right of trial by jury" only for "[s]uits at common law." U.S. Const. amend. VII. The Supreme Court has "consistently interpreted the phrase '[s]uits at common law' to refer to 'suits in which <u>legal</u> rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.'" <u>Granfinanciera</u>, 492 U.S. at 41 (quoting <u>Parsons v. Bedford</u>, 28 U.S. (3 Pet.) 433, 447 (1830)). Thus, the Seventh Amendment "applies to actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." <u>Id.</u> at 42.

As we noted earlier, the Supreme Court has set forth a two-part test to determine whether the Seventh Amendment applies to a particular claim. "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature." <u>Id.</u> (quoting <u>Tull v. United States</u>, 481 U.S. 412, 417–18 (1987)). The Court has held that the second part of the test "is more important than the first." <u>Id.</u>

Turning to the first part of the test, the action at issue here is for breach of contract implied in law. The action has a somewhat confusing history, compounded

9

by the fact that courts "have synonymously used a number of different terms" to refer to it. See Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co., 695 So. 2d 383, 386 (Fla. 4th DCA 1997) (en banc). Indeed, the action has been varyingly referred to as one based on "quasi contract," "unjust enrichment," "restitution," "constructive contract," and "quantum meruit." Id. But whatever the term, "all implied contract actions were part of the action of assumpsit, which was an action at law under the common law." Id. at 390; see also Georgia v. Brailsford, 2 U.S. (Dall.) 415, 417 (1793) (Iredell, J.) (referring to assumpsit as "the legal panacea of modern times"). Although some courts have referred to the action as being equitable in nature, "the term has been used in the sense of 'fairness,' to describe that quality which makes an enrichment unjust, and not as a reference to the equity side of the court." Commerce P'ship, 695 So. 2d at 390. Indeed, as one court explained:

> Unjust enrichment . . . is but the equitable reason for requiring payment for value of goods and services received. The theory of a case claiming a defendant has been unjustly enriched may be either legal or equitable.
>
> Our courts have used the phrases quasi-contract, contract implied-in-law, constructive contract, and quantum meruit synonymously. These are legal fictions providing a remedy to prevent unjust enrichment, thereby promoting justice and equity. But, they are legal fictions created by courts of law. They were triable at law and not in equity, thus one is entitled to jury trial upon them.

10

Nehi Beverage Co. of Indianapolis v. Petri, 537 N.E.2d 78, 85 (Ind. Ct. App. 1989) (citations omitted); accord 1 Corbin on Contracts § 1.20 n.8 (rev. ed. 2020) ("[Nehi] quite correctly ruled that, whatever the terminology, the action was at law and not in equity, thereby triable by jury.").

Another court explained the potential source of confusion regarding the nature of actions for breach of contract implied in law:

> The theory on which the plaintiff in this suit seeks money damages, unjust enrichment, sometimes referred to as restitution, a contract implied in law, quasi-contract, or an action in assumpsit, is the product of a long tradition in law, and is an action at law. The confusion with equity emanates from the decision of the King's Bench in 1760 in the case of Moses v. Macferlan, where Lord Mansfield stated that the defendant's obligation came "from the ties of natural justice" founded in "the equity of the plaintiff's case." . . . [T]he statement concerning the action of quasi-contract being equitable has been repeated many times, but merely refers to the way in which a claim should be approached since it is clear that the action is at law and the relief given is a simple money judgment.

Partipilo v. Hallman, 510 N.E.2d 8, 10–11 (Ill. Ct. App. 1987) (citations and quotation marks omitted).

Turning to the second, "more important" part of the test, we must "examine the remedy sought and determine whether it is legal or equitable in nature." Granfinanciera, 492 U.S. at 42. This step is significant; even though assumpsit is an action at law, if the remedy sought is equitable, then the case is properly heard in a court of equity.

11

In Great-West Life & Annuity Insurance Co. v. Knudson, 534 U.S. 204, 212 (2002), the Supreme Court had to determine whether the petitioners' claim for restitution constituted "equitable relief" within the meaning of 29 U.S.C. § 1132(a)(3). In relevant part, the Court explained as follows:

[N]ot all relief falling under the rubric of restitution is available in equity. In the days of the divided bench, restitution was available in certain cases at law, and in certain others in equity. Thus, "restitution is a legal remedy when ordered in a case at law and an equitable remedy . . . when ordered in an equity case," and whether it is legal or equitable depends on "the basis for [the plaintiff's] claim" and the nature of the underlying remedies sought.

In cases in which the plaintiff "could not assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him," the plaintiff had a right to restitution at law through an action derived from the common-law writ of assumpsit. In such cases, the plaintiff's claim was considered legal because he sought "to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money." Such claims were viewed essentially as actions at law for breach of contract (whether the contract was actual or implied).

In contrast, a plaintiff could seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession. A court of equity could then order a defendant to transfer title (in the case of the constructive trust) or to give a security interest (in the case of the equitable lien) to a plaintiff who was, in the eyes of equity, the true owner. But where "the property [sought to be recovered] or its proceeds have been dissipated so that no product remains, [the plaintiff's] claim is only that of a general creditor," and the plaintiff "cannot enforce a constructive trust of or an equitable lien upon other property of the [defendant]." Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability

12

on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.

Id. at 212–14 (citations omitted) (alterations in original).

Courts have applied Great-West's reasoning to unjust enrichment claims. See, e.g., Duty Free World, Inc. v. Miami Perfume Junction, Inc., 253 So. 3d 689, 697 (Fla. 3d DCA 2018) (Lagoa, J.). In Duty Free World, the issue was whether the plaintiffs' unjust enrichment claim fell within an arbitration clause's exception permitting the parties to "seek equitable . . . relief" in court. Id. at 693. Based on the plaintiffs' complaint, the court determined that the plaintiffs did not seek equitable relief. Id. at 697. Rather, the plaintiffs sought "nothing more than money to compensate them for payments [they] made under . . . purchase orders" for products the defendants refused to deliver. See id. In other words, the plaintiffs sought "the imposition of personal liability for the benefits that they conferred upon [the defendants]." Id. (quoting Great-West, 534 U.S. at 214). Thus, the court held that "[the plaintiffs'] unjust enrichment claim [sought] legal, rather than equitable, relief." Id. "Critical to [the court's] conclusion" was the fact that the plaintiffs did not allege that the funds they sought to recover could "clearly be traced to particular funds or property in [the defendants'] possession." Id. at 698 (quoting Great-West, 534 U.S. at 213). That is, the plaintiffs did not allege "that the [defendants] h[e]ld the particular funds paid under the purchase orders or that the [defendants]

13

possess[ed] particular property 'identified as belonging in good conscience to' [the plaintiffs]." Id.

Similarly, here, Hughes did not seek the return of particular property or funds. He gave no property or funds to Priderock; what he gave was his time and service, and that's not something Priderock could actually return. Nor did Hughes seek to recover any profits. What Hughes actually sought—indeed, what the parties specifically agreed the measure of damages would be—was "the value of the benefit Priderock received from [Hughes's] services."[2] Just as in Duty Free World and Great-West, we conclude that this type of relief is legal, not equitable, in nature.

Priderock maintains that "Hughes [sought] an equitable remedy—disgorgement." Priderock points to our recent decision in Hard Candy, in which we held that "an accounting and disgorgement of a defendant's profits in a trademark infringement case is equitable in nature and does not carry with it a right to a jury trial." 921 F.3d at 1359. But Hughes did not seek an accounting and disgorgement of Priderock's profits, nor is this a trademark infringement case, so Hard Candy is squarely inapplicable.

At bottom, Priderock mischaracterizes Hughes's requested relief as disgorgement. In Duty Free World, the plaintiffs' prayer for relief sought "equitable

---

[2] This is what the parties agreed to in their pretrial stipulation. It's what the parties argued at trial. And it's the very question the parties asked the jury to answer.

relief, including disgorgement," but the court held that the plaintiffs' "factual allegations [did] not support their characterization." 253 So. 3d at 698. The court noted that the plaintiffs explicitly "d[id] not plead any untoward profit to the [defendants] in their complaint" and instead sought "the restitution of the benefit they allegedly conferred upon the [defendants]." Id. at 698–99. Thus, because the plaintiffs' "factual allegations establish[ed] that their unjust enrichment claim [did] not seek . . . profits," the court concluded that the plaintiffs "[did] not seek the equitable remedy of disgorgement." Similarly, because Hughes sought to recover only the value of the benefit he conferred on Priderock—not to obtain any profits Priderock received—his remedy was not disgorgement but rather restitution in a purely legal sense. And we know that the jury's verdict didn't include profits because the jury was clearly told not to award a percentage of profits.

In sum, on part one of the Supreme Court's test, Hughes's action for breach of contract implied in law is comparable to the 18th century action of assumpsit, which was a legal action. On part two, Hughes's requested remedy—return of the benefit he conferred on Priderock—was legal in nature. Thus, having satisfied both parts of the test, Hughes had a right to a jury trial under the Seventh Amendment.

### Priderock's Motion for New Trial

Priderock moved for a new trial on the basis that the jury's verdict was contrary to both the district court's instructions and the clear weight of the evidence.

15

The district court denied Priderock's motion, noting only that "there was competent evidence to support the jury's verdict." Priderock repeats both of its arguments on appeal.

Turning to the first issue, Priderock argues that the jury disregarded the district court's instruction not to award a percentage of profits because the jury awarded Hughes $1,250,000—a figure Priderock assumes the jury reached "by following the instructions of Hughes's counsel in closing argument to award the plaintiff 5% of future profits, which he assured the jury would reach $20 million to $30 million." In other words, because "[f]ive percent of $25 million is $1,250,000," Priderock argues that "the math proves . . . the jury did what the court forbade."

We conclude that the district court did not abuse its discretion in denying Priderock's motion for new trial on this basis because Priderock failed to show that the jury awarded a percentage of profits over time. "Few tenets are more fundamental to our jury trial system than the presumption that juries obey the court's instructions." United States v. Stone, 9 F.3d 934, 938 (11th Cir. 1993). The presumption is "almost invariable." Id. (citation omitted). It is overcome only where there is an "overwhelming probability" that the jury was unable to follow the court's instructions. See id. (citation omitted). The presumption applies with as much force, if not more, to a court's response to a jury's question. See Weeks v. Angelone, 528

16

U.S. 225, 234 (2000) ("[A] jury is presumed to understand a judge's answer to its question.").

Priderock's mathematical argument is simply insufficient to overcome this powerful presumption. "[W]e cannot speculate as to what the jury 'meant' by its verdict." Murphy v. Georgia-Pacific Corp., 628 F.2d 862, 870 n.18 (5th Cir. 1980);[3] see also Krause v. Dresser Indus., Inc., 910 F.2d 674, 679 (10th Cir. 1990) ("[W]e will not speculate as to the jury's calculation methods, as long as the damage amount is supported by the evidence."); Chuy v. Phila. Eagles Football Club, 595 F.2d 1265, 1279 n.19 (3d Cir. 1979) (en banc) ("[I]t is well accepted that a court will not inquire into the calculation methods employed by the jury during its deliberations."). Absent any other evidence, Priderock failed to show that the jury ignored the district court's instructions not to award a percentage of profits.

Second, Priderock argues that the jury's verdict is contrary to the clear weight of the evidence because "[n]o evidence supports the jury's assumption that Priderock would make $20 million to $30 million in profits. And no evidence shows that Hughes was entitled to 5%, as opposed to 3% or 7% or 0.5%." Priderock focuses on the evidence of profits to the exclusion of all the other evidence on damages. Hughes argued to the jury that he worked 3,360 hours, a reasonable hourly rate was

---

[3] All decisions of the former Fifth Circuit announced before October 1, 1981, are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

17

$400, and thus he was entitled to $1,344,000.  Those figures were supported by sufficient evidence.  Indeed, Hughes testified that he had been paid $400 an hour for his services in the past.  Worley likewise testified that he would have paid Hughes that amount and that it "[p]robably would" have been a reasonable rate.  Finally, Hughes testified that, during the period he provided services to Priderock, he was "fully dedicated" and "treated it like [he] would an investment bank where [he] was working on a deal."  Although the parties did not agree on how many hours Hughes had worked, they agreed that he had provided services to Priderock for approximately 19–21 months.  As Hughes's counsel explained at closing, "21 months is 84 weeks" and "84 weeks at 40 hours[] [is] 3,360 hours."

Of course, the jury did not award Hughes $1,344,000, it awarded him $1,250,000.  But "the jury enjoys substantial discretion in awarding damages within the range shown by the evidence, and while the jury may not pull figures out of a hat, its verdict does not fail for a lack of exhaustive or dispositive evidence so long as a rational basis exists for the calculation."  United States v. Sullivan, 1 F.3d 1191, 1196 (11th Cir. 1993); see also In Re Urethane Antitrust Litig., 768 F.3d 1245, 1268 (10th Cir. 2014) ("Dow assumes that the jury could not adjust Dr. McClave's damages figure without his underlying calculations or some other tool.  This assumption is incorrect, for a jury can reduce an expert's calculations on damages even when unable to run the exact numbers and calculations of [a damages] model

18

with mathematical certainty." (citation and quotation marks omitted)); Luria Bros. & Co. v. Pielet Bros. Scrap Iron & Metal, Inc., 600 F.2d 103, 115 (7th Cir. 1979) ("The jury is entitled to disregard the damages asked for if they do not agree with the computations or if other evidence is introduced from which jurors could draw their own conclusions."). Here, the jury could have agreed with Priderock's argument at closing and rationally determined that Hughes worked less than 3,360 hours. Accordingly, the district court did not abuse its discretion in denying Priderock's motion for new trial.

## CONCLUSION

The district court correctly concluded that Hughes had a right to a jury trial under the Seventh Amendment. Thus, the district court did not err in denying Priderock's motion to strike Hughes's jury demand or abuse its discretion in denying Priderock's rule 59(e) motion. Likewise, the jury's verdict was not contrary to the district court's instructions or the clear weight of the evidence. Therefore, the district court did not abuse its discretion in denying Priderock's motion for new trial.

**AFFIRMED.**